2008 DEC 18  PM 1: 22

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

KENNETH W. LILES; PATRICIA M. LILES )
EDWARD R. WEBB; JAMES JOSEPHSON )
WILLIAM J. ANDREWS, JR.; MARK R. )
ROODVOETS; JON D. ANDREWS; )
CHARLES B. LESESNE; JERRY A. )
CICOLANI, JR.; KRIS BRENNEMAN; )
DANA L. BALLINGER and  SUSAN )
KHERKHER, )
)
        Plaintiffs, )
) Civil Action No. 3:08-CV-1217J-34JRK
)
    vs. )
)
DEFENDANTS GINN-LA WEST END, )
LIMITED; GINN FINANCIAL SERVICES; )
STEWART TITLE GUARANTY )
COMPANY; SIMON L. CONWAY; )
PICKET FENCE REALTY; )
ROBERT F. MASTERS II; EDWARD R. )
GINN, III, )
)
)
        Defendants. )
)
_____ )

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PLAINTIFFS, for their complaint herein, allege as follows:

## JURISDICTION

1.   This action arises under 15 U.S.C. §§ 1701 et seq., more commonly known as the Interstate Land Sales Full Disclosure Act ("ILSA").

2.   This Court has jurisdiction in this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1709 and 1719.

3.   This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state common-law claims alleged herein.

4.   This Court has personal jurisdiction over the Defendants and each of them because at all times relevant to this Complaint, Defendants, either individually or through their agents, officers or representatives, engaged in and carried on business activities in the State of Florida relating to the allegations herein; maintained business offices in the State of Florida; committed statutory violations within the State of Florida, as alleged herein; and caused injuries to Plaintiffs that arose out of acts or omissions that occurred within the State of Florida, as alleged herein.

## VENUE

5.   Venue for this action is appropriate in this Court under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 1719 because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and division, and because several of the Defendants reside and/or transact business in this district and division.

## THE PARTIES

6.   Plaintiffs KENNETH W. LILES and PATRICIA M. LILES ("LILES") are and, at all times relevant to the allegations herein, were residents of the State of Florida who purportedly entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the Versailles Sur Mer subdivision on Grand Bahama Island ("VSM" or the "VSM Subdivision").

7.   Plaintiff EDWARD R. WEBB ("WEBB") is and, at all times relevant to the allegations herein, was a resident of the State of Georgia who entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

8.   Plaintiff JAMES JOSEPHSON ("JOSEPHSON") is and, at all times relevant to the allegations herein, was a resident of the State of New York who entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

9.   Plaintiff WILLIAM J. ANDREWS, JR. ("WILLIAM ANDREWS") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina. Plaintiff MARK R. ROODVOETS ("ROODVOETS") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina. Plaintiff JON D. ANDREWS ("JON ANDREWS") is and, at all times relevant to the allegations herein, was a resident of the State of South Carolina. Plaintiff CHARLES B. LESESNE ("LESESNE") is and, at all times relevant to the allegations herein, was a resident of the State of Florida. Plaintiffs WILLIAM ANDREWS, ROODVOETS, JON ANDREWS

3

and LESESNE (collectively "ANDREWS GROUP") together did enter into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

10.   Plaintiffs JERRY A. CICOLANI, JR. and KRIS BRENNEMAN ("CICOLANI PARTNERSHIP") are and, at all times relevant to the allegations herein, were residents of the State of Ohio who purportedly entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

11.   Plaintiff DANA L. BALLINGER ("BALLINGER") is and, at all times relevant to the allegations herein, was a resident of the State of Florida who entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

12.   Plaintiff SUSAN C. KHERKHER ("KHERKHER") is and, at all times relevant to the allegations herein, was a resident of the State of Texas who entered into a contract for the purchase of and did purportedly purchase an undeveloped parcel of real property in the VSM Subdivision.

13.   Upon information and belief, Defendant GINN-LA WEST END, LIMITED ("GINN-LA WEST END") is a foreign corporation with its principal place of business at 31 Lupi Court, Palm Coast, Florida 32137.  The 2008 Florida Annual Report for Defendant GINN-LA WEST END lists Defendant EDWARD ROBERT GINN, III as its Chairman and Defendant ROBERT F. MASTERS as its President.

14.  Upon information and belief, Defendant GINN FINANCIAL SERVICES ("GINN FINANCIAL") is a Georgia limited liability company with its principal place of business at 31 Lupi Court, Palm Coast, Florida 32137.  GINN FINANCIAL is a licensed mortgage lender in the State of Florida, license number L100000558788.  The 2008 Florida Annual Report for Defendant GINN FINANCIAL lists Defendant ROBERT F. MASTERS as its Manager.

15.  Upon information and belief, Defendant STEWART TITLE GUARANTY COMPANY ("STEWART TITLE") is a Texas corporation with its principal place of business at 1980 Post Oak Blvd, Suite 800, Houston, Texas 77056.  Defendant STEWART TITLE maintains offices and conducts business in the State of Florida.

16.  Defendant SIMON L. CONWAY ("CONWAY") resides at 9757 Camberley Circle, Orlando, Florida, 32836.  Defendant CONWAY is a real estate broker licensed by the State of Florida.  Defendant CONWAY is currently registered with the State of Florida as a manager of the following corporate entities:  Picket Fence Realty, LLC and REO Realty, LLC.

17.  Defendant PICKET FENCE REALTY ("PICKET FENCE") is a Florida Limited Liability Corporation owned and operated by Defendant CONWAY.  Defendant PICKET FENCE REALTY maintains its office at 9757 Camberley Circle, Orlando, Florida, 32836.

18.  Upon information and belief, Defendant ROBERT F. MASTERS II ("MASTERS") resides at 184 Sea Colony Parkway, Saint Augustine, Florida 32080-

5

6765.   At all times relevant to the allegations herein, Defendant MASTERS served as the President of Defendant GINN-LA WEST END.  In addition, Defendant MASTERS did, at all times relevant to the allegations herein, serve as the Executive Vice President of Ginn Development Company, LLC ("GINN DEVELOPMENT"), the Manager of Ginn-LA CS Borrower, and the President of Ginn-LA Conduit Lender.

19.   Upon information and belief, Defendant EDWARD R. ("BOBBY") GINN, III ("BOBBY GINN") resides at 42 Island Estates Parkway, Palm Coast, Florida 32137.   At all times relevant to the allegations herein, Defendant BOBBY GINN served as the Chairman of Defendant GINN-LA WEST END.  In addition, at all times relevant to the allegations herein, DEFENDANT BOBBY GINN served as the Chairman and CEO of GINN DEVELOPMENT.

20.   Upon information and belief, at all times relevant to the allegations herein, Defendant GINN-LA WEST END was engaged in the development and the sale of lots in the VSM Subdivision, which activities include but are not limited to the formulation and the implementation of a promotional plan for the sale of lots in the VSM Subdivision; the approval of sales literature and methods used by sales executives and other employees; obtaining financing for the VSM Subdivision; and obtaining the approval of all U.S. and Bahamian governmental entities that would permit Defendant GINN-LA WEST END to subdivide, develop and sell lots in VSM.  Defendant GINN-LA WEST END did direct and control the manner in which its employees and agents acted at all times relevant to the allegations herein.

21.   Upon information and belief, Defendant GINN FINANCIAL entered into an agreement with one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN to ensure that prospective purchasers in the VSM Subdivision could obtain financing for their lot purchases in the VSM Subdivision.  Upon further information and belief, Defendants GINN FINANCIAL, GINN-LA WEST END, MASTERS and BOBBY GINN knew that it would be difficult, if not impossible, for prospective purchasers in the VSM Subdivision to obtain financing from financial institutions outside of the United States for the purchase of lots in the Bahamas.  Upon further information and belief, Defendants GINN FINANCIAL, GINN-LA WEST END, MASTERS and BOBBY GINN recognized that unless Defendant GINN FINANCIAL offered financing for lot purchases in the VSM Subdivision, many prospective purchasers would not be able to close on their lot purchases in the VSM Subdivision.

22.   Upon information and belief, Defendants GINN FINANCIAL, GINN-LA WEST END, MASTERS and BOBBY GINN did take the necessary steps to allow Defendant GINN FINANCIAL to offer lot loans for purchases in the Bahamas.  Upon further information and belief, in order to be able to offer lot loans in the Bahamas, Defendants GINN FINANCIAL, GINN-LA WEST END, MASTERS and BOBBY GINN did enter into an agreement with Credit Suisse, whereby Credit Suisse would provide the end-funding for lot loans in the VSM Subdivision that were processed, underwritten and closed by Defendant GINN FINANCIAL.  Upon further information and belief, Defendant GINN FINANCIAL did allow its name to be used in marketing communications for the VSM Subdivision as a primary source of financing for the

7

purchase of lots in the VSM Subdivision.  Defendant GINN FINANCIAL did direct and control the manner in which its employees and agents acted at all times relevant to the allegations herein.

23.   Upon information and belief, Defendant STEWART TITLE entered into an agreement with Defendants GINN-LA WEST END, MASTERS and BOBBY GINN, whereby STEWART TITLE agreed to provide title insurance policies for lots in the VSM Subdivision.  Upon further information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE knew that providing title insurance through Defendant STEWART TITLE would be an essential inducement for many prospective purchasers in the VSM Subdivision, without which those prospective purchasers would not purchase lots in the VSM subdivision.  Upon further information and belief, the availability of title insurance protection from Defendant STEWART TITLE was therefore a marketing device for Defendants GINN-LA WEST END, MASTERS and BOBBY GINN that was used to induce prospective purchasers to buy lots in the VSM Subdivision.  Upon further information and belief, Defendant STEWART TITLE did allow its name to be used in marketing communications for the VSM Subdivision as the reason why prospective purchasers should feel confident that they would receive consumer protection with escrow and title insurance for their purchase of lots in the VSM Subdivision.  Defendant STEWART TITLE did direct and control the manner in which its employees and agents acted at all times relevant to the allegations herein.

24.   Upon information and belief, Defendant GINN-LA WEST END or some other Ginn entity did employ Howie Malloy as a Sales Executive to market and sell lots in the VSM Subdivision.  Upon further information and belief, Howie Malloy was paid a sales/broker commission by Defendant GINN-LA WEST END or some other Ginn entity on the sale of those lots in the VSM Subdivision for which he acted as the Sales Executive.  Upon further information and belief, the amount of Howie Malloy's sales/broker commission for a particular VSM lot was based upon, among other things, the sales price for that lot.

25.   Upon information and belief, at all times relevant to the allegations herein, Ginn Sales Executive Howie Malloy did act as the agent of Defendant GINN-LA WEST END in implementing a promotional plan for the sale of lots in the VSM Subdivision, in making representations to prospective purchasers concerning the purchase of lots in the VSM Subdivision, and in making representations to the general public concerning the purchase of lots in the VSM Subdivision.  Upon further information and belief, in all actions undertaken by Ginn Sales Executive Howie Malloy relating to purchases of lots in the VSM Subdivision, Howie Malloy was acting as the agent of Defendant GINN-LA WEST END and was acting within the course and scope of his agency, so that all such actions are therefore imputed to Defendant GINN-LA WEST END.

26.   Upon information and belief, Defendant CONWAY served as an outside real estate broker for the sale of certain lots in the VSM Subdivision, pursuant to a contract between Defendant PICKET FENCE REALTY and Defendant GINN-LA WEST END or some other Ginn entity.  Upon information and belief, Defendant CONWAY did receive

100% of each sales/broker commission that was paid to Defendant PICKET FENCE

REALTY by Defendant GINN-LA WEST END or some other Ginn entity on the sale of

those lots in the VSM Subdivision for which Defendant CONWAY served as the outside

real estate broker.  Upon information and belief, the amount of the sales/broker

commission paid to Defendant PICKET FENCE REALTY for the sale of a particular

VSM lot was based upon, among other things, the sales price for that lot.

27.   Upon information and belief, Defendant CONWAY, in his capacity as the owner

of Defendant PICKET FENCE REALTY, did advertise for sale the lots in the VSM

Subdivision, make representations to prospective purchasers concerning the purchase of

lots in the VSM Subdivision, and make representations to the general public concerning

the purchase of lots in the VSM Subdivision.  Upon further information and belief, in all

actions undertaken by Defendant CONWAY relating to purchases of lots in the VSM

Subdivision, with the exception of Defendant CONWAY'S representations concerning

his personal investment in the VSM Subdivision, Defendant CONWAY did act in his

capacity as the owner of Defendant PICKET FENCE REALTY.  With respect to

Defendant CONWAY'S representations concerning his personal investment in the VSM

Subdivision, Defendant CONWAY did act in his individual capacity.

28.   Upon information and belief, at all times relevant to the allegations herein,

Defendant MASTERS was directly responsible for the management of Defendants

GINN-LA WEST END and GINN FINANCIAL, including but not limited to the

formulation and the implementation of a promotional plan for the sale of lots in the VSM

Subdivision; the setting of prices for lots in the VSM Subdivision; the approval of sales

10

literature and methods used by salesmen and other employees of Defendant GINN-LA WEST END; obtaining financing for the VSM Subdivision; taking the necessary steps to allow Defendant GINN FINANCIAL to offer financing for lot purchases in the VSM Subdivision, and obtaining the approval of all U.S. and Bahamian governmental entities that would permit Defendant GINN-LA WEST END to subdivide, develop and sell lots in the VSM Subdivision.

29.   Upon information and belief, at all times relevant to the allegations herein, Defendant BOBBY GINN was directly responsible for the management of Defendants GINN-LA WEST END and GINN FINANCIAL, including but not limited to the formulation and the implementation of a promotional plan for the sale of lots in the VSM Subdivision; the setting of prices for lots in the VSM Subdivision; the approval of sales literature and methods used by salesmen and other employees of Defendant GINN-LA WEST END; obtaining financing for the VSM Subdivision; taking the necessary steps to allow Defendant GINN FINANCIAL to offer financing for lot purchases in the VSM Subdivision, and obtaining the approval of all U.S. and Bahamian governmental entities that would permit Defendant GINN-LA WEST END to subdivide, develop and sell lots in the VSM Subdivision.

30.   At all times relevant to the allegations herein, Defendant BOBBY GINN was personally and directly involved in the marketing of lots in the VSM Subdivision.  Upon information and belief, at all times relevant to the allegations herein, Defendant BOBBY GINN did use the corporate forms of Defendants GINN-LA WEST END and GINN FINANCIAL, as well as other corporate entities bearing the Ginn name but presently

unknown to Plaintiffs, for the purpose of defrauding investors in the VSM Subdivision, including Plaintiffs.

31.   Upon information and belief, at all times relevant to the allegations herein, Defendants GINN-LA WEST END and GINN FINANCIAL were corporate entities operated by Defendant BOBBY GINN for a fraudulent purpose.   Upon further information and belief, as a result of the actions perpetrated by and through Defendants GINN-LA WEST END and GINN FINANCIAL, Defendant BOBBY GINN engaged in fraud and self-dealing and was unjustly enriched, all to the detriment of investors in the VSM Subdivision, including Plaintiffs.

32.   Upon information and belief, Defendant GINN-LA WEST END has persons who are its agents, servants and employees, and all acts or omissions relevant to the allegations herein that were performed by those agents, servants and employees occurred during the course and scope of their agency and employment and are therefore imputed to Defendant GINN-LA WEST END.

33.   Upon information and belief, Defendant GINN FINANCIAL has persons who are its agents, servants and employees, and all acts or omissions relevant to the allegations herein that were performed by those agents, servants and employees occurred during the course and scope of their agency and employment and are therefore imputed to Defendant GINN FINANCIAL.

34.   Upon information and belief, Defendant STEWART TITLE has persons who are its agents, servants and employees, and all acts or omissions relevant to the allegations

herein that were performed by those agents, servants and employees occurred during the course and scope of their agency and employment and are therefore imputed to Defendant STEWART TITLE.

## **GENERAL FACTS**

### **GINN DEVELOPMENT'S Purchase of Land for the VSM Subdivision**

35.   On or about November 17, 2004, GINN DEVELOPMENT did enter into a contract with the Grand Bahama Hotel Company ("GBHC"), whereby GBHC would sell, and GINN DEVELOPMENT would purchase, certain land located on Grand Bahama Island (the "GBHC Contract").

36.   Upon information and belief, the GBHC Contract purported to convey approximately 1700 acres to GINN DEVELOPMENT, which GINN DEVELOPMENT intended to use for the development of the VSM Subdivision (the "VSM Land").

37.   The GBHC Contract provided, at Section 7, entitled "Title and Survey Matters," that GINN DEVELOPMENT did agree to accept title to the VSM Land subject to certain enumerated "Title Exceptions," and that title to the VSM Land would be conveyed to GINN DEVELOPMENT subject to those "Title Exceptions."  One of the "Title Exceptions" set forth in the GBHC Contract stated that "GBHC may not hold fee simple documentary title to approximately 80 acres" that were denominated as "Parcel E."

38.   The GBHC Contract provided that GINN DEVELOPMENT would commence an action to obtain a Certificate of Title for "Parcel E" from the Supreme Court of the

Bahamas, pursuant to the Quieting Titles Act.  The GBHC Contract provided that GBHC

and GINN DEVELOPMENT anticipated that the Quiet Title Action to be filed by GINN

DEVELOPMENT would not be concluded by the closing date for the GBHC Contract

and, in such event, GINN DEVELOPMENT would "accept at Closing a conveyance of

'all right, title and interest' of GBHC in and to Parcel E, without representation or

warranty whatsoever as to the status of GBHC's interest in and to Parcel E."

39.    The GBHC Contract provided, at Section 7, entitled "Title and Survey Matters,"

that GINN DEVELOPMENT was aware of the existence of litigation captioned, *Angela*

*Williams v. Grand Bahama Properties Limited, West End Resorts, Ltd., Old Bahama Bay*

*Management Limited, and Old Bahama Community Association Ltd. (the "Williams*

*Litigation,"* and that GINN DEVELOPMENT did agree to accept title to the VSM Land

subject to that litigation.

40.    Defendant MASTERS executed the GBHC Contract on behalf of GINN

DEVELOPMENT, and on a date unknown to Plaintiffs, GINN DEVELOPMENT closed

on its purchase of the VSM Land.

41.    Upon information and belief, Defendant STEWART TITLE did supply a Policy

of Title Insurance to GINN DEVELOPMENT and/or Defendant GINN-LA WEST END

for the purchase of the VSM Land through the GBHC Contract.  Upon further

information and belief, Defendant STEWART TITLE, either on its own behalf or through

its agent G.B. Completions Title Insurance Agency Ltd., did conduct a title investigation

on the VSM Land for one or more of GINN DEVELOPMENT and Defendant GINN-LA

WEST END prior to the closing date for GINN DEVELOPMENT'S purchase of the VSM Land through the GBHC Contract.

42.   Upon information and belief, on some date subsequent to the date on which GINN DEVELOPMENT closed on its purchase of the VSM Land, GINN DEVELOPMENT did transfer all right and title in the VSM Land to Defendant GINN-LA WEST END.

## Bahamas Supreme Court Actions Filed By Defendant GINN-LA WEST END and GBHC in an Effort to Obtain Title to Parcel E

### Supreme Court Equity Action No. 59 of 2005:

43.   Upon information and belief, Defendant GINN-LA WEST END did file an action in the Supreme Court of the Commonwealth of the Bahamas denominated Supreme Court Equity Action No. 59 of 2005 ("Action No. 59 of 2005") against GBHC.

44.   Upon information and belief, Defendant GINN-LA WEST END did file Action No. 59 of 2005 on April 7, 2005, which date was subsequent to the closing date for the sale of the VSM Land by GBHC to GINN DEVELOPMENT.  Upon further information and belief, GBHC did file Action No. 59 of 2005 in the City of Freeport on the island of Grand Bahama.

45.   Upon information and belief, Defendant GINN-LA WEST END did ask the Supreme Court in Action No. 59 of 2005 to determine what land had been conveyed to GBHC by Charles A. Sammons, the predecessor in title to GBHC.  Upon information and

belief, Defendant GINN-LA WEST END intended to utilize Action No. 59 of 2005 to determine precisely what land GBHC had title to at the time of the closing date for the sale of the VSM Land by GBHC to GINN DEVELOPMENT, and therefore what land GBHC had conveyed to GINN DEVELOPMENT through the GBHC Contract.

**Supreme Court Equity Action No. 511 of 2005:**

46.   Upon information and belief, GBHC did initiate a quieting title action in the Supreme Court of the Commonwealth of the Bahamas denominated Supreme Court Equity Action No. 511 of 2005 ("Action No. 511 of 2005"), on behalf of Defendant GINN-LA WEST END.

47.   Upon information and belief, GBHC did file Action No. 511 of 2005 on May 17, 2005, at a time when Action No. 59 of 2005 was still pending before the Bahamas Supreme Court in the City of Freeport, on the Bahamian island of Grand Bahama.  Upon further information and belief, GBHC did file Action No. 511 of 2005 in the City of Nassau, on the Bahamian island of New Providence.

48.   Upon information and belief, both GINN DEVELOPMENT and Defendant GINN-LA WEST END failed to inform the Supreme Court in Action 59 of 2005 that GBHC had filed Action 511 of 2005.

49.   Upon information and belief, GBHC did ask the Supreme Court in Action No. 511 of 2005 to issue a certificate of title to Defendant GINN-LA WEST END for 179.1 acres of the VSM Land, which acreage included that 80 acre tract of the VSM Land denominated in the GBHC Contract as Parcel E.

50.   Upon information and belief, Defendant GINN-LA WEST END was not a petitioner in Action No. 511 of 2005.  Upon information and belief, the sole petitioner in Action No. 511 of 2005 was GBHC.

51.   Upon information and belief, GBHC did represent to the Supreme Court in Action No. 511 of 2005 that GBHC had good and marketable title to the 179.1 acres that was the subject of Action No. 511 of 2005.

52.   Upon information and belief, counsel for GBHC did represent to the Supreme Court in Action No. 511 of 2005 that GBHC had complied with the requirements of the Bahamas Quieting Titles Act, and had produced a good root of title exceeding the statutorily required period of 30 years.

53.   The Judgment issued by the Supreme Court in Action No. 511 of 2005 set forth what counsel for GBHC had represented to the Supreme Court concerning the reason GBHC was seeking a certificate of title to be issued to Defendant GINN-LA WEST END:

> *Noting that the Petitioner was satisfied that it had a good and marketable title counsel informed the court that the reason the Petitioner had sought a Certificate was because there were two plans and those plans showed a discrepancy in trying to total the entirety of the strips set out in the second plan to conform with the total acreage.*

54.   Upon information and belief, GBHC and GBHC'S counsel knew that the reason given to the Supreme Court for seeking the Certificate of Title, (i.e., clearing up a discrepancy between two plans), was false and misleading.

55.   Upon information and belief, GBHC and GBHC'S counsel were using Action No. 511 of 2005 to obtain a Certificate of Title for Defendant GINN-LA WEST END for that 80 acre tract denominated in the GBHC Contract as Parcel E, by hiding that 80 acre tract within the larger 179.1 acre tract that was the subject of Action No. 511.

56.   Upon information and belief, GBHC and GBHC'S counsel knew that GBHC did not have good and marketable title to that 80 acre tract denominated in the GBHC Contract as Parcel E, because the GBHC Contract provided that, "*GBHC may not hold fee simple documentary title to approximately 80 acres of the Land, depicted as Parcel 'E.'*"

57.   Upon information and belief, GBHC and GBHC'S counsel failed to inform the Supreme Court in Action No. 511 of 2005 that the GBHC Contract provided that "*GBHC may not hold fee simple documentary title to approximately 80 acres of the Land, depicted as Parcel 'E.'*"

58.   Upon information and belief, GBHC and GBHC'S counsel also failed to inform the Supreme Court in Action No. 511 of 2005 that Defendant GINN-LA WEST END had filed Action No. 59 of 2005, and that Action No. 59 of 2005 was still pending before the Bahamas Supreme Court in the City of Freeport on the island of Grand Bahama.  Upon further information and belief, GINN DEVELOPMENT and one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did devise a plan with GBHC to file Action No. 511 of 2005 in the Bahamas Supreme Court in the City of Nassau on the island of New Providence, notwithstanding the fact that the land that was the subject of Action No. 511 of 2005 was located on the island of Grand Bahama, in an effort to

conceal the existence of Action No. 511 of 2005 from the Supreme Court in the City of Freeport on the island of Grand Bahama and in an effort to conceal the existence of Action No. 59 of 2005 from the Supreme Court in the City of Nassau on the island of New Providence.

59.   Upon information and belief, GBHC did not meet the requirements of the Bahamian Quieting Titles Act as to Parcel E.  Upon further information and belief, Defendant GINN-LA WEST END did not meet the requirements of the Bahamian Quieting Titles Act as to Parcel E.

60.   Upon information and belief, the Supreme Court in Action No. 511 of 2005 did issue a Judgment quieting title in the name of Defendant GINN-LA WEST END for the 179.1 acre tract that was the subject of Action No. 511, which acreage included that 80-acre tract denominated in the GBHC Contract as Parcel E.

## GINN DEVELOPMENT'S Financing of Land for the VSM Subdivision

61.   Upon information and belief, in order to facilitate its purchase of the VSM Land from GBHC, GINN DEVELOPMENT or some other Ginn entity presently unknown to Plaintiffs did obtain a mortgage from GBHC, which mortgage encumbered the VSM Land (the "Original GBHC Mortgage").

62.   Upon information and belief, one or more of GINN DEVELOPMENT, Defendants GINN-LA WEST END, GINN FINANCIAL, MASTERS and BOBBY GINN did cause two other Ginn entities called Ginn-LA CS Borrower, LLC ("GINN-LA CS BORROWER") and Ginn-LA Conduit Lender, Inc. ("GINN-LA CONDUIT

LENDER") to obtain financing on or about June 8, 2006 in the form of a $675 million credit facility funded by approximately 50 private investors ("Credit Suisse Lenders") and facilitated by Credit Suisse, which financing was used in part to satisfy the Original GBHC Mortgage ("Credit Suisse Credit Facility").

63.   Upon information and belief, the $675 million Credit Suisse Credit Facility obtained by GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER was not solely intended to fund the development of the VSM Subdivision.  Upon further information and belief, the Credit Suisse Credit Facility was obtained in order to fund the development of at least four separate subdivisions being developed by purportedly different Ginn corporate entities:  (1) the VSM Subdivision on Grand Bahama Island; (2) the Tesoro subdivision in Port Saint Lucie, Florida; (3) the Quail West Subdivision in Naples, Florida; and (4) the Laurelmore subdivision in North Carolina (the "Credit Suisse Financed Subdivisions").

64.   Upon information and belief, the ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet the payment obligations under the Credit Suisse Credit Facility was dependent, to some degree, upon the United States real estate market and particularly upon the Florida real estate market, upon the success of each of the Credit Suisse Financed Subdivisions, and upon the financial stability of each of the purportedly distinct Ginn corporate entities that was involved in the development of the Credit Suisse Financed Subdivisions.

65.   Upon information and belief, under the terms of the Credit Suisse Credit Facility, GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER pledged

certain portions of the VSM Land, including certain VSM lots, as collateral (the "VSM Collateral Land"). Upon information and belief, under the terms of the Credit Suisse Credit Facility, in the event of a default by GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER that was not cured, the Credit Suisse Lenders would be entitled to take ownership of the VSM Collateral Land.

66.   Upon information and belief, the capitalization of the VSM Subdivision was dependent, to some extent, upon the sales of lots within the VSM Subdivision. Upon further information and belief, if Defendant GINN-LA WEST END did not make sales of lots in the VSM Subdivision at a sufficient rate, certain adverse results could occur that would cause damages to purchasers in the VSM Subdivision, including Plaintiffs. For example:

    a.   GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER may not be able to meet their obligations under the Credit Suisse Credit Facility.

    b.   Defendant GINN-LA WEST END may not have sufficient funding to complete the development of the VSM Subdivision.

    c.   Other damages to purchasers in the VSM Subdivision might result, which damages were foreseeable to Defendants GINN-LA WEST END, MASTERS and BOBBY GINN but were not disclosed to prospective purchasers in the VSM Subdivision, including Plaintiffs.

67. Upon information and belief, in the event that GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER defaulted on the Credit Suisse Credit Facility, causing the Credit Suisse Lenders to take ownership of the VSM Collateral Land, several adverse results could occur that would cause damages to purchasers in the VSM Subdivision, including Plaintiffs. For example,

a. Defendant GINN-LA WEST END could lose some or all of its rights to control the development and operation of the VSM Subdivision.

b. Defendant GINN-LA WEST END could lose the right to sell hundreds of lots in the VSM Subdivision that were tied up with the Credit Suisse Default.

c. Defendant GINN-LA WEST END could have trouble securing alternate financing for the development of the VSM Subdivision.

d. Defendant GINN-LA WEST END may make concessions in an effort to resolve a default on the Credit Suisse Credit Facility, which concessions might reduce the value of and/or interfere with the marketability of lots held by purchasers in the VSM Subdivision, including Plaintiffs.

e. Adverse publicity surrounding a default on the Credit Suisse Credit Facility might reduce the value of and/or interfere with the marketability of lots held by purchasers in the VSM Subdivision, including Plaintiffs.

f. Other damages to purchasers in the VSM Subdivision might result, which damages were foreseeable to Defendants GINN-LA WEST END,

MASTERS and BOBBY GINN but were not disclosed to prospective purchasers in the VSM Subdivision, including Plaintiffs.

### Ginn's Arrangement with Stewart Title

68.   Upon information and belief, one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did enter into an arrangement with Defendant STEWART TITLE, whereby Defendant STEWART TITLE agreed to serve as the escrow agent for lots sold by Defendant GINN-LA WEST END in the VSM Subdivision.

69.   Upon information and belief, one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did enter into an arrangement with Defendant STEWART TITLE, whereby Defendant STEWART TITLE agreed to provide title insurance for purchasers of lots in the VSM subdivision.

70.   Upon information and belief, it is standard practice in connection with property purchased in the Bahamas for Bahamian lawyers to issue a title opinion letter instead of providing a title insurance policy underwritten by a title insurance company.

71.   Upon information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE knew that many prospective purchasers would not consider purchasing property in the Bahamas without a title insurance commitment and policy customary in real estate transactions occurring in the United States.  Upon further information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE knew that providing title insurance through Defendant STEWART TITLE would be an essential inducement for many prospective purchasers in

the VSM Subdivision, without which those prospective purchasers would not purchase lots in the VSM subdivision.

72.   Upon information and belief, one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did enter into an arrangement with Defendant STEWART TITLE, whereby Defendant STEWART TITLE agreed to serve as the closing agent for purchases in the VSM Subdivision.

73.   Upon information and belief, it is standard practice in connection with property purchased in the Bahamas for closings to take place in the Bahamas.

74.   Upon information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE knew that many prospective purchasers would find it inconvenient, if not prohibitive, to travel to the Bahamas for a closing on the purchase of a lot in the VSM Subdivision.  Upon further information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE knew that the ability to hold closings in the United States with Defendant STEWART TITLE as the closing agent would be an essential inducement for many prospective purchasers in the VSM Subdivision, without which those prospective purchasers would not purchase lots in the VSM subdivision.

75.   Upon information and belief, Defendant STEWART TITLE did enter into an agency agreement with an attorney named Veronica Grant, whereby Veronica Grant would form an entity to be known as G.B. Completions Title Insurance Agency Ltd. ("G.B. Completions").  Upon further information and belief, Defendant STEWART

24

TITLE did enter into an agency agreement with G.B. Completions, whereby G.B. Completions would open an office in Freeport, Grand Bahama for the sole purpose of facilitating real estate closings, issuing title insurance and filing necessary documents with the Bahamian government for purchases in the VSM Subdivision.  Upon further information and belief, in all actions undertaken by G.B. Completions relating to purchases of lots in the VSM Subdivision, G.B. Completions was acting as the agent of Defendant STEWART TITLE and G.B. Completions was acting within the course and scope of its agency, so that all such actions are therefore imputed to Defendant STEWART TITLE.

76.   Upon information and belief, G.B. Completions never facilitated any other real estate closings other than those for Defendant STEWART TITLE for purchases in the VSM Subdivision.  Upon further information and belief, Defendant STEWART TITLE did not have an agent operating in Grand Bahama to facilitate real estate closings and issue title insurance prior to entering into the agency agreement with G.B. Completions.

77.   Upon information and belief, Defendant STEWART TITLE did agree to allow one or more of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN to state in marketing materials for the VSM Subdivision that Defendant STEWART TITLE would facilitate real estate closings with the protections of escrow and title insurance to purchasers of lots in the VSM Subdivision.

78.   Upon information and belief, Defendant STEWART TITLE, as the closing agent for purchases in the VSM Subdivision, was responsible for, among other things, ensuring that the Indenture of Conveyance ("Conveyance Deed") for lots purchased in the VSM

Subdivision was recorded with the Registrar General's Office in the Bahamas.  Upon further information and belief the Conveyance Deeds for lots purchased in the VSM Subdivision were routinely not recorded until several months following the closing dates for the sale of those lots.

79.  Upon information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE did come to an arrangement whereby closings for lots purchased in the VSM Subdivision could be conducted without requiring a purchaser to travel to the Bahamas.  Upon further information and belief, under this arrangement, a purchaser would sign the closing documents in the United States before a witness who was provided by one or more of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE, where after the witness would travel to the Bahamas to appear before Veronica Grant of G.B. Completions in order to sign the Affidavit of Witness that forms an essential part of the Conveyance Deed under Bahamian Law.  Upon information and belief, Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE all knew that the requirement that a purchaser sign the closing documents before a witness and the requirement that the witness appear in the Bahamas before Veronica Grant in order to sign the Affidavit of Witness were both essential in order to complete the closing process for the purchase of real property in the Bahamas.

## **The Marketing Campaign for the VSM Subdivision**

80.   In an effort to induce prospective purchasers, including Plaintiffs, to buy lots in the VSM Subdivision, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN have engaged in a massive and elaborate marketing campaign, that included the following representations:

81.   Representations that Defendant BOBBY GINN was the inspiration behind the VSM Subdivision and that he would ensure that the VSM Subdivision would be developed according to plan and to his high standards.

a.   Upon information and belief, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN developed elaborate written marketing materials for the VSM Subdivision, which included a large book with the GINN logo and "Versailles Sur Mer" embossed in gold on the cover (the "VSM Marketing Book").  The VSM Marketing Book is 58 pages, bound and printed on heavy stock, and features pictures of Versailles (which was described as the inspiration for the VSM Subdivision), pictures of Grand Bahama Island, pictures of yachts and private planes, and artist renderings of the VSM Subdivision as it would purportedly be developed.  The VSM Marketing Book includes elaborate descriptions of how Defendant BOBBY GINN would develop the VSM Subdivision.  The VSM Marketing Book states, in an introductory message signed by Bobby Ginn:

*"The fact is, we would not have compromised the integrity of our vision, nor would we have shared any plans that we weren't 100% certain we*

*could both develop and operate to the level you've come to expect from the Ginn Clubs and Resorts team."*

    b.   The VSM Marketing Book states:  *"Like the Sun King, Bobby Ginn is very present when it comes to bringing his visions to life.  He sets the tone, approves the plans and ensures that what is created is what he intended."*

    c.   The VSM Marketing Book states:  *"The influence of the Sun King [Louis XIV] and his vision began with a palace, embraced a city and then rippled throughout the countryside of Europe.  The power elite created their own tributes to Versailles with sumptuous castles and fountain-filled gardens.  Today a new tribute is being created across the sea on the island of Grand Bahama.  This new vision belongs to Bobby Ginn (Ginn Clubs & Resorts Founder) and, like Louise XIV, he will compromise nothing to see it fulfilled."*

82.   <u>Representations that the VSM Subdivision is a $4.9 billion development.</u>

    a.   A May 30, 2006 press release entitled, "Ginn Resorts Announces 'Ginn sur Mer' As Name of Grand Bahama Island Resort," which is available on the website for the VSM Subdivision, carries the subtitle, *"$4.9 Billion Project Will Be Company's Flagship Caribbean Development."*  The press release states that *"Ginn Resorts ... has committed to carrying out a $4.9 billion world-class resort community ...."*

b. An October 20, 2006 press release entitled, "Ginn sur Mer to Redefine Caribbean Resort Experience," available on the website for the VSM Subdivision, states, *"Ginn sur Mer, the $4.9 billion resort community under development by Ginn Resorts will engulf boating enthusiasts in a world of tropical spendor."*

83.   <u>Representations that the VSM Subdivision will include a grand palace as the focal point of the entire development</u>.

a. The VSM Marketing Book states:  *"Versailles sur Mer will feature an impeccably-designed grand palace as the central and defining point of an entire community.  Not a replica of the original Versailles, but one that embraces its bold spirit.  Inside its elegant walls adorned with stunning accoutrements will be a variety of dining experiences, world-class shopping, inviting spas, night clubs, activity centers for the children and a Monte Carlo-inspired casino."*

b. The VSM Marketing Book features several artist renderings of the "grand palace" and states:  *"The gardens, the golf, the marina, the canal:  they are but players in the grand play of Versailles sur Mer.  The star and main attraction will forever be the towering iconic building that will be ever present throughout the community and will be recognized for miles around.  While we employed the spirit of the Sun King's Versailles as an inspiration, we do not intend to recreate it.  Le Palais will be a singularly unique vision and, because of modern technology and several*

*advancements over the past few centuries, in some ways better than the original.  Le Palais will take advantage of its tropical setting offering breathtaking views at every turn and creating a seamless indoor-outdoor experience.  The inspiration is regal.  The location is tropical. The vision is the only one of its kind."*

c.   The VSM Marketing Book features an artist rendering of the lobby of the "grand palace" and states:  *"Imagine the feeling of awe that must have stricken visitors upon first setting foot into the Hall of Mirrors around the dawn of the 18th century.  It will be reborn in the hearts of those who first step foot into the main lobby of Versailles sur Mer at the dawn of the 21st century.  Ornamented lavishly with a host of tropical plants, the Main Lobby will feature cascading water that appears to fall from thin air.  The canopy of glass fixed overhead will give view to the sun as it races across the sky.  And every time you enter, you'll know that you've arrived."*

d.   The VSM Marketing Book states:  *Located just 55 miles from Palm Beach, the West End acts as a gateway for The Bahamas and all of the Caribbean islands.  Yachts and cruise ships sailing from Florida char their course alongside its shores regardless of their destination.  Soon, they'll be witness to an impressive sight as they've never known in the islands.  From miles away they'll see it – almost rising out of the sea.  As they get closer it will continue to grow on the horizon until at last they are upon it and its reality eclipses its perception."*

    e. The October 20, 2006 press release entitled, "Ginn sur Mer to Redefine Caribbean Resort Experience," states that the resort will be *"centered around an impeccably designed grand palace ...."*

84. <u>Representations that the VSM Subdivision will include a Monte Carlo-style casino.</u>

    a. The VSM Marketing Book features an artist rendering of an elaborate casino and states: *"For Versailles sur Mer, we have envisioned nothing short of the premier casino in the islands. Baccarat. Blackjack. Roulette. Whatever your pleasure. The experience will be that of sophistication. The service will be beyond compare. As you stroll to the tables, you'll feel a sense of Monte Carlo and possibly hear the whisper of a king."*

    b. The VSM Marketing Book states: *"Versailles sur Mer will feature an impeccably-designed grand palace as the central and defining point of an entire community. Not a replica of the original Versailles, but one that embraces its bold spirit. Inside its elegant walls adorned with stunning accoutrements will be a variety of dining experiences, world-class shopping, inviting spas, night clubs, activity centers for the children and a Monte Carlo-inspired casino."*

    c. The May 30, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn Resorts Announces 'Ginn sur Mer' As Name of Grand Bahama Island Resort," states that *"Ginn Resorts ... has*

committed to carrying out a $4.9 billion world-class resort community that will contain the following components: ... A casino ...."

    d.   The October 20, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn sur Mer to Redefine Caribbean Resort Experience," states, *"A Monte-Carlo style casino ... will offer recreational diversions ...."*

85.  <u>Representations that the VSM Subdivision will include a mega-yacht marina</u>.

    a.   The VSM Marketing Book features a photograph of large yachts lined up at a marina and states:  *"Running parallel to the Grand Canal will be a world-class mega-yacht marina that will welcome travelers from Florida as members of the court were once welcomed from Paris. Their yachts will be offered fuel and receive the care afforded visiting dignitaries. It is here where you will also be able to charter a boat for a day or snorkeling, fishing or sightseeing. Along the marina will sit the Grand Promenade – a pedestrian walkway that will offer a variety of restaurants, with seating both inside and out, along with hand-selected shopts stocked with the world's finest treasures. Dine with friends in the glow of the Bahamian sun as you watch the fleet of yachts heading to and returning from ocean adventures. The boating lifestyle is one that will be inherently celebrated in this resort community that will be eternally one with the sea."*

b. The October 20, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn sur Mer to Redefine Caribbean Resort Experience," states, *"Just 55 miles from South Florida awaits a mega-yacht marina with 380 slips and private customs facilities.  Under the direction of a harbormaster owning decades of experience in the luxury boating realm, guests can dock their own boat with peace of mind knowing it will receive special care – or arrange a charter for a day of snorkeling, fishing or sightseeing."*

86.  <u>Representations that the VSM Subdivision will include two golf courses designed by Jack Nicklaus and Arnold Palmer.</u>

a. The VSM Marketing Book features a photo of Jack Nicklaus and Arnold Palmer together and states:  *"To craft the golf experience at Versailles sur Mer, we have commissioned two of the finest players and designers the game of golf has ever known.  Jack Nicklaus (The Golden Bear) and Arnold Palmer (The King) will create two unique courses, each featuring oceanfront holds, strategic routing and all the colors of paradise. . . .These signature courses will be the first Bahamian courses for each designer.  They will be the best in the islands and two of the best in the world...."*

b. The May 30, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn Resorts Announces 'Ginn sur Mer' As Name of Grand Bahama Island Resort," states that *"Ginn Resorts ... has*

*committed to carrying out a $4.9 billion world-class resort community*

*that will contain the following components: ... Two Signature golf courses*

*and clubhouses ...."*

 c. The October 20, 2006 press release, available on the website for the VSM

  Subdivision and entitled, "Ginn sur Mer to Redefine Caribbean Resort

  Experience," states, *"To craft the golf experience at Ginn sur Mer,*

  *legends Jack Nicklaus and Arnold Palmer were commissioned to create*

  *two Signature courses, each featuring oceanfront holes, strategic routing*

  *and all the colors of paradise. For decades, these two masters have*

  *engaged in competition, while bringing out the best in each other. The*

  *same will be true of their course designs here, which will be the first*

  *Bahamian project for each."*

 87. <u>Representations that the VSM Subdivision will include nightclubs, shops and</u>

<u>restaurants.</u>

 a. The VSM Marketing Book features an artist rendering of restaurants

  sitting along a marina and states: *"Along the marina will sit the Grand*

  *Promenade – a pedestrian walkway that will offer a variety of restaurants,*

  *with seating both inside and out, along with hand-selected shops stocked*

  *with the world's finest treasures. Dine with friends in the glow of the*

  *Bahamian sun as you watch the fleet of yachts heading to and returning*

  *from ocean adventures. The boating lifestyle is one that will be inherently*

*celebrated in this resort community that will be eternally one with the sea."*

b.  The VSM Marketing Book also states:  *"The restaurants we will offer both inside and outside the palace will offer a variety of dishes for your selection while consistently providing service fit for a king.  Every dining venue will feature expansive views of the Grand Canal, beaches and ocean.  And you will be delighted with a balanced selection of European cuisine mixed with island favorites.  As with every experience at Versailles sur Mer, Dining will always be a pleasure."*

c.  The VSM Marketing Book also states:  *"Versailles sur Mer will feature an impeccably-designed grand palace as the central and defining point of an entire community.  Not a replica of the original Versailles, but one that embraces its bold spirit.  Inside its elegant walls adorned with stunning accoutrements will be a variety of dining experiences, world-class shopping, inviting spas, night clubs, activity centers for the children and a Monte Carlo-inspired casino."*

d.  The October 20, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn sur Mer to Redefine Caribbean Resort Experience," states that *"inviting spas, nightclubs, a variety of eateries ... will offer recreational diversions for every member of the family."*

35

88. <u>Representations that the VSM Subdivision will include 4,400 condominium and hotel units, centered around a 20-story tower.</u>

    a. The May 30, 2006 press release, available on the website for the VSM Subdivision and entitled, "Ginn Resorts Announces 'Ginn sur Mer' As Name of Grand Bahama Island Resort," states that *"Ginn Resorts ... has committed to carrying out a $4.9 billion world-class resort community that will contain the following components: ... 4,400 condominium and hotel units, centered around a 20-story tower ...."*

89. <u>Representations that purchasing lots in the VSM Subdivision was a good investment strategy.</u>

    a. On or about mid-2006, Defendant CONWAY co-hosted a radio show called the "Home Team" with Plaintiff BALLINGER'S brother, which radio show aired on Orlando radio station 540 WFLA every Sunday between noon and 1:00 p.m. On the Home Team radio show, Defendant CONWAY did hold himself out to the general public as having expertise in real estate and real estate investing. In addition, Defendant CONWAY did hold himself out to the general public as having prior knowledge and experience with various Ginn entities and developments around the country.

    b. On at least three separate occasions, Defendant CONWAY utilized the "Home Team" radio show to advertise the VSM Subdivision to the

general public. Although the "Home Team" radio show was broadcast locally, anyone with access to the internet could listen to the radio show from a computer anywhere in the world. During the August 13, 2006 "Home Team" radio show, Defendant CONWAY made representations to the general public about the VSM Subdivision, which representations were intended to convince prospective purchasers to contact him about purchasing lots in the VSM Subdivision. Those representations included the following statements:

i. *"The state of the housing market in Florida is – or anywhere else in the USA – is just not relevant to this project in my opinion, because you are talking about bringing in worldwide investors. It's unquestionably a high-end community – no question about it at all. <u>But if you're an investor, I believe you will make money</u>."*

ii. *"And we have this great opportunity, of course, for the listeners, which is that I can bring them with me. We can go take a look at this island. And we can do it on a private plane . . . we will fly them into the airstrip that is within the middle of this community, which is what's making it attractive to a lot of people. That and the fact that there's lots and lots of boat slips, and good boat slips are incredibly hard to come by now in South Florida. So, 55 miles away in the Bahamas, you can have your own boat slip with your own home, <u>on an incredible investment opportunity. I believe that.</u>*

> *To the point now, where my own money is on the table. That's how much I believe it.*"

    iii. "*I'm on the ocean, my friend. Yeah, oceanfront. So I've done it, and as I say, I've put my money where my mouth is. I believe in this community. I believe investors will do great there.*"

    iv. "*It's so early in this stage of the community, that prices will just never be better than they are right now, which means, they're just going to go up and that's the only way they can go, because there's almost nothing there. I'm really not exaggerating when I say that. There's almost nothing there.*"

c. For one of the weekly "Home Team" radio shows, Defendant CONWAY invited Ginn Sales Executive Howie Malloy to appear as a guest to talk about the VSM Subdivision. Upon information and belief, one or more of Defendant GINN-LA WEST END or some other Ginn entity presently unknown to plaintiffs did pay Defendant CONWAY for the privilege of using the "Home Team" radio show to market the VSM Subdivision. During the August 23, 2006 "Home Team" radio show, Defendant CONWAY and Ginn Sales Executive Howie Malloy made representations to the general public about the VSM Subdivision, which representations were intended to convince prospective purchasers to buy lots in the VSM Subdivision. Those representations included the following:

i.   Defendant CONWAY:  *"And now is certainly, I mean in my opinion, clearly I've done it, so I am putting my money where my mouth is, but now is, <u>there's no better time to do it</u>."*

Howie Malloy:  *"No, yeah.  My wife and I –"*

Defendant CONWAY:  *"<u>Because it's never going to be this cheap again</u>."*

ii.  Howie Malloy:  *"No.  My wife and I did the same thing.  We moved forward about 2-3 months ago and bought a homesite, again and we just look forward to things changing over the next and evolving over the next 3-4 years."*

iii. Defendant CONWAY:  *"<u>This isn't for your average investor. This probably isn't for somebody who doesn't have the wherewithal to make their first venture into real estate investing.  But for those of you that do, it's very worthwhile</u>. And, clearly, as I said before, I believe it, because Howie, you've got my money.  You're taking good care of it, I hope."*

iv.  Defendant CONWAY:   *"<u>They can see the potential.  And although this truly is, I believe, a wonderful investment</u>, I can honestly see myself and my wife ending up there in a few years time."*

39

     v.  Howie Malloy:  *"And we're expecting prices to increase fairly dramatically over the next couple of months, so anybody with even remote interest in what we have planned, please get on board as soon as possible.  As Simon well knows, the earlier you buy in with Ginn, the better off you are."*

## Defendant CONWAY'S False Representations That He Had Purchased a Lot in the VSM Subdivision

90.  On two separate occasions during the Home Team Radio show, Defendant CONWAY made representations to the general public that he had personally purchased a lot in the VSM Subdivision.

91.  During the August 13, 2006 Home Team radio show, Defendant CONWAY made the following representations:

     a.  *"I've told you before.  I put my money where my mouth is.  I've told you that before.  I've committed now myself to acquire a piece of land in this project in the Bahamas that we've been talking about for a few weeks now."*

     b.  *"Myself, along with one of my clients, Ken in Springfield . . . we have basically acquired a piece of this property.  And we're very pleased that we've done so.  It's a stunning opportunity.  A stunning opportunity."*

    c.    *"And we have this great opportunity, of course, for the listeners, which is that I can bring them with me. We can go take a look at this island. And we can do it on a private plane . . . we will fly them into the airstrip that is within the middle of this community, which is what's making it attractive to a lot of people. That and the fact that there's lots and lots of boat slips, and good boat slips are incredibly hard to come by now in South Florida. So, 55 miles away in the Bahamas, you can have your own boat slip with your own home, on an incredible investment opportunity. <u>I believe that. To the point now, where my own money is on the table. That's how much I believe it.</u>"*

    d.    *"<u>I've done it. I'm in. Yep.</u>"*

    e.    *"<u>I'm on the ocean, my friend. Yeah, oceanfront. So I've done it, and as I say, I've put my money where my mouth is</u>. I believe in this community. I believe investors will do great there."*

92.   During the August 23, 2006 Home Team radio show, Defendant CONWAY made the following representations:

    a.    *"<u>It's been about 2 months, maybe slightly longer since you were on the show. The biggest change, of course, is that I'm now an owner.</u>"*

b. *"And now is certainly, <u>I mean in my opinion, clearly I've done it, so I am putting my money where my mouth is</u>, but now is, there's no better time to do it."*

c. *"This isn't for your average investor.  This probably isn't for somebody who doesn't have the wherewithal to make their first venture into real estate investing.  But for those of you that do, it's very worthwhile.  <u>And, clearly, as I said before, I believe it, because Howie, you've got my money.  You're taking good care of it, I hope</u>."*

d. *"They can see the potential.  <u>And although this truly is, I believe, a wonderful investment, I can honestly see myself and my wife ending up there in a few years time</u>."*

93.   These representations made by Defendant CONWAY on the "Home Team" radio show were made to the general public with the intent to induce the general public to purchase lots in the VSM Subdivision.  Defendant CONWAY intended that the public look to him as an expert in the area of real estate and rely on his statements made during the radio show.  Defendant CONWAY intended for listeners to contact him about purchasing a lot in the VSM Subdivision.   Defendant CONWAY intended to profit from his representations on the "Home Team" radio show when he received a commission for sales in the VSM Subdivision that were generated by his representations.

94.  Defendant CONWAY'S representations that he had purchased a lot in the VSM Subdivision were false.  Defendant CONWAY never purchased a lot in the VSM Subdivision.

### Plaintiffs LILES' Purported Purchase of Lot 46 in the VSM Subdivision

95.  Plaintiffs LILES were both named on the contract for the purchase of Lot 46 in the VSM Subdivision (the "LILES CONTRACT").  Plaintiff KENNETH W. LILES, by and through Attorney-in-Fact Richard T. Davis, purportedly executed the "LILES CONTRACT" on July 28, 2006.  Attorney-in-Fact Richard T. Davis did not ever execute the LILES CONTRACT on behalf of Plaintiff PATRICIA M. LILES.

96.  Plaintiffs LILES purportedly closed on their purchase of Lot 46 in the VSM Subdivision on or about December 13, 2006.

97.  Upon information and belief, Plaintiffs LILES have never received a copy of a recorded Conveyance Deed for their purchase of Lot 46 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

### Plaintiff WEBB'S Purported Purchase of Lot 261 in the VSM Subdivision

98.   Plaintiff WEBB executed a contract with Defendant GINN-LA WEST END for the purchase of Lot 261 in the VSM Subdivision (the "WEBB CONTRACT") on December 8, 2006.

99.   Upon information and belief, Plaintiff WEBB purportedly closed on his purchase of Lot 261 in the VSM Subdivision on or about February 2, 2007.

100.      Upon information and belief, Plaintiff WEBB has never received a copy of a recorded Conveyance Deed for his purchase of Lot 261 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

### Plaintiffs JOSEPHSON'S Purported Purchase of Lot 493 in the VSM Subdivision

101.      Plaintiff JOSEPHSON executed a contract with Defendant GINN-LA WEST END for the purchase of Lot 493 in the VSM Subdivision (the "JOSEPHSON CONTRACT") on October 8, 2006.

102.      Some Ginn entity presently unknown to Plaintiffs did send Plaintiff JOSEPHSON the closing documents for his purchase of Lot 493 in the VSM Subdivision (the "JOSEPHSON CLOSING DOCUMENTS") via either mail or Federal Express, whereupon Plaintiff JOSEPHSON did sign and return the JOSEPHSON CLOSING

DOCUMENTS to said Ginn entity via either mail or Federal Express.  Plaintiff JOSEPHSON did not sign the JOSEPHSON CLOSING DOCUMENTS in the presence of any witness.

103.     Plaintiff JOSEPHSON purportedly closed on his purchase of Lot 493 in the VSM Subdivision on or about December 13, 2006.

104.     Upon information and belief, Plaintiff JOSEPHSON has never received a copy of a recorded Conveyance Deed for his purchase of Lot 493 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

**Plaintiffs ANDREWS GROUP'S Purported Purchase of Lot 272 in the**

**VSM Subdivision**

105.     Plaintiffs ANDREWS GROUP executed a contract with Defendant GINN-LA WEST END for the purchase of Lot 272 in the VSM Subdivision (the "ANDREWS GROUP CONTRACT") on October 19, 2006.

106.     Plaintiffs ANDREWS GROUP purportedly closed on their purchase of Lot 272 in the VSM Subdivision on or about March 23, 2007.

107.     Upon information and belief, Plaintiff s ANDREWS GROUP have never received a copy of a recorded Conveyance Deed for their purchase of Lot 272 in the

VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

## Plaintiffs CICOLANI PARTNERSHIP'S Purported Purchase of Lot 104 in the VSM Subdivision

108.    Plaintiffs CICOLANI PARTNERSHIP, by and through Attorney-in-Fact Richard T. Davis, purportedly executed a contract with Defendant GINN-LA WEST END for the purchase of Lot 104 in the VSM Subdivision (the "CICOLANI PARTNERSHIP CONTRACT") on October 5, 2006.

109.    Plaintiffs CICOLANI PARTNERSHIP purportedly closed on their purchase of Lot 104 in the VSM Subdivision on or about March 23, 2007.

110.    Upon information and belief, Plaintiffs CICOLANI PARTNERSHIP have never received a copy of a recorded Conveyance Deed for their purchase of Lot 104 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

### Plaintiff BALLINGER'S Purported Purchase of Lot 222 in the VSM Subdivision

111.     Plaintiff BALLINGER executed a contract with Defendant GINN-LA WEST END for the purchase of Lot 222 in the VSM Subdivision (the "BALLINGER CONTRACT") on October 10, 2006.

112.     Some Ginn entity presently unknown to Plaintiffs did send Plaintiff BALLINGER the closing documents for her purchase of Lot 222 in the VSM Subdivision (the "BALLINGER CLOSING DOCUMENTS") via Federal Express, whereupon Plaintiff BALLINGER did sign and return the BALLINGER CLOSING DOCUMENTS to said Ginn entity via Federal Express.  Plaintiff BALLINGER did not sign the BALLINGER CLOSING DOCUMENTS in the presence of any witness.

113.     Plaintiff BALLINGER purportedly closed on her purchase of Lot 222 in the VSM Subdivision on or about December 22, 2006.

114.     Ginn Sales Executive Howie Malloy served as the GINN Sales Executive for Plaintiff BALLINGER'S purchase.  Upon information and belief, following the closing of Plaintiff BALLINGER'S purchase, Ginn Sales Executive Howie Malloy did receive some portion of a commission of $64,097.25 on that purchase.

115.     Upon information and belief, Defendant CONWAY did refer Plaintiff BALLINGER to Ginn Sales Executive Howie Malloy sometime in mid-2006 as a prospective purchaser in the VSM Subdivision.  Upon further information and belief, following the closing of Plaintiff BALLINGER'S purchase, Defendant CONWAY did

receive a commission of $61,045.00 on that purchase, which commission was payable to Defendant PICKET FENCE REALTY.

116.     Upon information and belief, Plaintiff BALLINGER has never received a copy of a recorded Conveyance Deed for her purchase of Lot 222 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END.

**Plaintiff KHERKHER'S Purported Purchase of Lot 270 in the VSM Subdivision**

117.     Plaintiff KHERKHER executed the contract with Defendant GINN-LA WEST END for the purchase of Lot 270 in the VSM Subdivision (the "KHERKHER CONTRACT") on February 5, 2007.

118.     Plaintiff KHERKHER purportedly closed on her purchase of Lot 270 in the VSM Subdivision on or about March 20, 2007.

119.     Upon information and belief, Plaintiff KHERKHER did not receive a copy of a recorded Conveyance Deed for her purchase of Lot 270 in the VSM Subdivision, which Conveyance Deed warrants at least that Defendant GINN-LA WEST END has not conveyed the lot to another person and that the lot is free from encumbrances made by Defendant GINN-LA WEST END or any other person claiming by, through, or under Defendant GINN-LA WEST END, until August 18, 2008, approximately 16 months after she closed on her purchase of Lot 270.

**2007 Litigation Filed By Relatives of Angela Williams Challenging the Certificate of**

**Title Granted to Defendant GINN-LA WEST END in Action No. 511 of 2005**

120.    Upon information and belief, a relative of the plaintiff in the "Williams

Litigation," which had been set forth as a "Permitted Title Exception" in the GBHC

Contract, filed a 2007 lawsuit the Supreme Court of the Commonwealth of the Bahamas

(the "Cooper Litigation"), which lawsuit challenges the Certificate of Title that was

granted to Defendant GINN-LA WEST END in Action No. 511 of 2005.

121.    The plaintiff in the Cooper Litigation alleges that GBHC did make

material misrepresentations and conceal material facts in its efforts to have the Certificate

of Title issued to Defendant GINN-LA WEST END in Action No. 511 of 2005.

122.    Upon information and belief, the Cooper Litigation is ongoing in the

Bahamas Supreme Court.

**The Credit Suisse Default**

123.    Upon information and belief, on June 30, 2008, GINN-LA CS

BORROWER and/or GINN-LA CONDUIT LENDER defaulted on the $675 million

Credit Suisse Credit Facility (the "Credit Suisse Default"), which financing directly

affects the development of the VSM Subdivision.  Upon further information and belief,

as of the date of this filing, GINN-LA CS BORROWER and/or GINN-LA CONDUIT

LENDER have not cured the Credit Suisse Default, have not negotiated a restructuring of

the Credit Suisse Credit Facility, and have not secured an alternate source of financing for the development of the VSM Subdivision as marketed.

124.     Upon information and belief, the Credit Suisse Lenders have seized hundreds of lots in the VSM Subdivision in response to the Credit Suisse Default.  Upon further information and belief, sales activities for the VSM Subdivision have been suspended since the Credit Suisse Default and remain suspended pending resolution of the Credit Suisse Default.

125.     Upon information and belief, on or about June 8, 2008, GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER did enter into a modification of the Credit Suisse Credit Facility whereby GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER did agree to borrow additional funds from the Credit Suisse Lenders, which funds are intended to be used in the development of two of the original Credit Suisse Financed Subdivisions: the Tesoro subdivision in Port Saint Lucie, Florida and the Quail West subdivision in Naples, Florida (the "Credit Suisse Modification"). Upon information and belief, the Credit Suisse Modification does not relieve GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER of their obligations under the Credit Suisse Credit Facility, does not resolve the Credit Suisse Default, and does not provide any additional funding for use in the development of the VSM Subdivision.

126.     To date, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN have not provided any information to Plaintiffs concerning the Credit Suisse Default; concerning whether there has been a suspension of sales in the VSM Subdivision as a result of the Credit Suisse Default; concerning whether the Credit Suisse Lenders

have taken ownership of the VSM Collateral Land; concerning whether, if the Credit

Suisse Lenders have in fact taken ownership of the VSM Collateral Land, Defendant

GINN-LA WEST END has lost any rights to control the development and operation of

the VSM Subdivision; concerning the ability of Defendant GINN-LA WEST END to

obtain alternate financing for the development of the VSM Subdivision; concerning

whether the Credit Suisse Default has affected the scope of the development as marketed

by Defendants GINN-LA WEST END, MASTERS and BOBBY GINN; or concerning

any other ways in which the Credit Suisse Default might have a material impact on the

value or marketability of the lots that Plaintiffs purchased in the VSM Subdivision.

### Plaintiffs LILE'S Title Insurance Claim Filed with Defendant STEWART TITLE

127.     Defendant STEWART TITLE did provide Plaintiffs LILES with a Policy

of Title Insurance for Lot 46, which Plaintiffs LILES purchased in the VSM Subdivision.

128.     On or about November, 2008, Plaintiffs LILES learned about the Cooper

Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST

END in Action No. 511 of 2006.

129.     On November 7, 2008, Plaintiffs LILES did send Defendant STEWART

TITLE a certified letter containing a written notice of claim against the Policy of Title

Insurance for Lot 46.

130.     To date, Defendant STEWART TITLE has failed to communicate with

Plaintiffs LILES concerning their notice of claim.

## Plaintiff WEBB'S Title Insurance Claim Filed with Defendant STEWART TITLE

131.     Defendant STEWART TITLE did provide Plaintiff WEBB with a Policy of Title Insurance for Lot 261, which Plaintiff WEBB purchased in the VSM Subdivision.

132.     On or about October, 2008, Plaintiff WEBB learned about the Cooper Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST END in Action No. 511 of 2006.

133.     On October 28, 2008, Plaintiff WEBB did send Defendant STEWART TITLE a certified letter containing a written notice of claim against the Policy of Title Insurance for Lot 261.

134.     To date, Defendant STEWART TITLE has failed to communicate with Plaintiff WEBB concerning his notice of claim.

## Plaintiffs JOSEPHSON'S Title Insurance Claim Filed with Defendant STEWART TITLE

135.     Defendant STEWART TITLE did provide Plaintiff JOSEPHSON with a Policy of Title Insurance for Lot 493, which Plaintiff JOSEPHSON purchased in the VSM Subdivision.

136.     On or about November, 2008, Plaintiff JOSEPHSON learned about the Cooper Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST END in Action No. 511 of 2006.

137.     On December 4, 2008, Plaintiff JOSEPHSON did send Defendant STEWART TITLE a certified letter containing a written notice of claim against the Policy of Title Insurance for Lot 493.

138.     To date, Defendant STEWART TITLE has failed to communicate with Plaintiff JOSEPHSON concerning his notice of claim.

<u>**Plaintiffs ANDREW GROUP'S Title Insurance Claim Filed with**</u>

<u>**Defendant STEWART TITLE**</u>

139.     Defendant STEWART TITLE did provide Plaintiffs ANDREWS GROUP with a Policy of Title Insurance for Lot 272, which Plaintiffs ANDREWS GROUP purchased in the VSM Subdivision.

140.     On or about November, 2008, Plaintiffs ANDREWS GROUP learned about the Cooper Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST END in Action No. 511 of 2006.

141.     On November 21, 2008, Plaintiffs ANDREWS GROUP did send Defendant STEWART TITLE a certified letter containing a written notice of claim against the Policy of Title Insurance for Lot 272.

142.     To date, Defendant STEWART TITLE has failed to communicate with Plaintiffs ANDREWS GROUP concerning their notice of claim.

## Defendant BALLINGER'S Title Insurance Claim Filed with

## Defendant STEWART TITLE

143.     Defendant STEWART TITLE did provide Plaintiff BALLINGER with a Policy of Title Insurance for Lot 222, which Plaintiff BALLINGER purchased in the VSM Subdivision.

144.     On or about August 2008, Plaintiff BALLINGER learned about the Cooper Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST END in Action No. 511 of 2006.

145.     On August 19, 2008, Plaintiff BALLINGER sent an email to Defendant STEWART TITLE indicating that she wished to make a claim against the Policy of Title Insurance for Lot 222.  On September 2, 2008, Plaintiff BALLINGER sent a certified letter containing a written notice of claim against the Policy of Title Insurance for Lot 222.

146.     On September 11, 2008, Plaintiff BALLINGER received an email from Defendant STEWART TITLE acknowledging receipt of what it referred to as Plaintiff BALLINGER'S "notice inquiring about coverage."  On September 23, 2008 Plaintiff BALLINGER sent a reply email to Defendant STEWART TITLE asking how long it expected to take to evaluate and make a coverage determination on her claim.

147.     To date, Defendant STEWART TITLE has failed to communicate further with Plaintiff BALLINGER concerning her notice of claim.

### Defendant KHERKHER'S Title Insurance Claim Filed with

### Defendant STEWART TITLE

148.     Defendant STEWART TITLE did provide Plaintiff KHERKHER with a Policy of Title Insurance for Lot 270 which Plaintiff KHERKHER purchased in the VSM Subdivision.

149.     On or about early August 2008, Plaintiff KHERKHER learned about the Cooper Litigation challenging the Certificate of Title granted to Defendant GINN-LA WEST END in the Action No. 511 of 2006.

150.     On September 2, 2008, Plaintiff KHERKHER sent a certified letter to Stewart Title asserting a claim against the Policy of Title Insurance for Lot 270.

151.     On October 14, 2008 Plaintiff KHERKHER sent an email to Defendant STEWART TITLE asking how long it expected to take to evaluate and make a coverage determination on her claim and the claim of Plaintiff BALLINGER.

152.     To date, Defendant STEWART TITLE has failed to communicate with Plaintiff KHERKHER concerning her notice of claim.

### The Applicability of ILSA

153.     At all times relevant to the allegations herein, Plaintiffs LILES, WEBB, JOSEPHSON, ANDREWS GROUP, CICOLANI PARTNERSHIP, BALLINGER and KHERKHER were "purchasers" as defined in 15 U.S.C. § 1701(a)(10).

154.     At all times relevant to the allegations herein, Defendant GINN-LA WEST END was a "developer" as defined in 15 U.S.C. § 1701(a)(5).  At all times relevant to the allegations herein, Defendant GINN-LA WEST END was engaged in, and caused others to be engaged in, the advertising, sale and offering for sale of lots in the VSM Subdivision.

155.     At all times relevant to the allegations herein, Defendant GINN FINANCIAL was a "developer" as defined in 15 U.S.C. § 1701(a)(5) and an "agent" as defined in 15 U.S.C. § 1701(a)(6).  At all times relevant to the allegations herein, Defendant GINN FINANCIAL represented, acted for and acted on behalf of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN in the advertising and offering of lots for sale in the VSM Subdivision.

156.     At all times relevant to the allegations herein, Defendant STEWART TITLE was a "developer" as defined in 15 U.S.C. § 1701(a)(5) and an "agent" as defined in 15 U.S.C. § 1701(a)(6).  At all times relevant to the allegations herein, Defendant STEWART TITLE represented, acted for and acted on behalf of Defendants GINN-LA WEST END, MASTERS and BOBBY GINN by serving as the escrow and closing agent for lot purchases in the VSM Subdivision and by providing title insurance to the purchasers of lots in the VSM Subdivision, including plaintiffs.

157.     At all times relevant to the allegations herein, Defendant CONWAY was a "developer" as defined in 15 U.S.C. § 1701(a)(5) and an "agent" as defined in 15 U.S.C. § 1701(a)(6).  At all times relevant to the allegations herein, except for his personal representations that he had invested in the VSM Subdivision, Defendant

CONWAY represented Defendants GINN-LA WEST END, MASTERS and BOBBY GINN in the advertising and offering of lots for sale in the VSM Subdivision.

158.     At all times relevant to the allegations herein, Defendant PICKET FENCE REALTY was a "developer" as defined in 15 U.S.C. § 1701(a)(5) and an "agent" as defined in 15 U.S.C. § 1701(a)(6).  At all times relevant to the allegations herein, Defendant PICKET FENCE REALTY represented Defendants GINN-LA WEST END, MASTERS and BOBBY GINN in the advertising and offering of lots for sale in the VSM Subdivision.

159.     At all times relevant to the allegations herein, Defendant MASTERS was a "developer" as defined in 15 U.S.C. § 1701(a)(5) and an "agent" as defined in 15 U.S.C. § 1701(a)(6).  At all times relevant to the allegations herein, Defendant MASTERS represented, acted for and acted on behalf of Defendants GINN-LA WEST END and BOBBY GINN in the advertising, sale and offering of lots for sale in the VSM Subdivision.

160.     At all times relevant to the allegations herein, Defendants BOBBY GINN was a "developer" as defined in 15 U.S.C. § 1701(a)(5).  At all times relevant to the allegations herein, Defendant BOBBY GINN was engaged in, and caused others to be engaged in, the advertising, sale and offering for sale of lots in the VSM Subdivision.

161.     At all times relevant to the allegations herein, the VSM Subdivision was a "subdivision" as defined in 15 U.S.C. § 1701(a)(3) in that it was comprised of land that

was divided and proposed to be divided into 50 or more lots for the purpose of sale as part of a common promotional plan.

162.     At all times relevant to the allegations herein, each representation made by Defendants GINN-LA WEST END, MASTERS and BOBBY GINN, which representation was made to induce, solicit or encourage any person to acquire a lot in the VSM Subdivision, was an "offer" as defined in 15 U.S.C. § 1701(a)(3).

163.     At all times relevant to the allegations herein, each representation made by Defendant CONWAY, which representation was made to induce, solicit or encourage any person to acquire a lot in the VSM Subdivision but with the exception of the personal representations that Defendant CONWAY had purchased a lot in the VSM Subdivision, was an "offer" as defined in 15 U.S.C. § 1701(a)(3).

164.     At all time relevant to the allegations herein, sales of lots in the VSM Subdivision were marketed, promoted and sold through means and instruments of communications in interstate commerce and through the mails.  As a result all Defendants' activities in marketing, promoting and selling the VSM lots are subject to 15 U.S.C. §§ 1701 et seq., and the regulations issued under those sections.

165.     At all times relevant to the allegations herein, the Credit Suisse Credit Facility entered into by GINN-LA CS BORROWER and GINN-LA CONDUIT LENDER, was a "blanket encumbrance" as defined in 15 U.S.C. § 1701(a)(7).

166.     At all times relevant to the allegations herein, the Office of Interstate Land Sales, United States Department of Housing and Urban Development, was an agency of

the United States of America and was responsible for, among other things, the

registration and regulation of the sale and offering and the advertising for sale by

developers of property located in subdivisions as more fully described in the Interstate

Land Sales full disclosure act of 1968, Title 15 United States Code, section 1701, et seq.

167.     Sometime in the period between late 2005 and mid-2006, Defendants

GINN-LA WEST END, MASTERS and BOBBY GINN did cause to be filed with the

Office of Interstate Land Sales, United States Department of Housing and Urban

Development, a Statement of Record and supporting documentation, and more than one

version of a Property Report, purporting to contain all material facts and pertinent

information relating to the VSM Subdivision, including information relating to the

developers of the VSM Subdivision.  Upon information and belief, Defendant

MASTERS executed all versions of the Property Report for the VSM Subdivision that

were filed by Defendants GINN-LA WEST END, MASTERS and BOBBY GINN.

168.     Upon information and belief, at all times relevant to the allegations herein,

Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did cause to be

provided to prospective purchasers of lots in the VSM Subdivision some version of a

Property Report, purporting to have been prepared in accordance with the requirements

of the Office of Interstate Land Sales, United States Department of Housing and Urban

Development and the Interstate Land Sales full disclosure act of 1968, Title 15 United

States Code, section 1701, et seq., and purporting to contain all current material facts and

pertinent information relating to the VSM Subdivision, including information relating to

the developers of the VSM Subdivision.

169.     Some Ginn agent or entity did provide Plaintiffs LILES with a Property Report for the VSM Subdivision, sent via Federal Express, which Property Report was dated June 28, 2006 and executed by Defendant MASTERS.

170.     Some Ginn agent or entity did provide Plaintiffs WEBB, JOSEPHSON, ANDREWS GROUP, CICOLANI PARTNERSHIP, BALLINGER and KHERKHER each with a Property Report for the VSM Subdivision, sent via Federal Express, which Property Reports were dated September 12, 2006 and executed by Defendant MASTERS.

### Certain Defendants' Use of Interstate Commerce and the Mails

171.     At all time relevant to the allegations herein, Defendants GINN-LA WEST END, GINN FINANCIAL, STEWART TITLE, MASTERS, CONWAY and BOBBY GINN did knowingly and willfully make use of the means and instruments of transportation and communications of interstate commerce of the United States, including U.S. mail, Federal Express, radio, telephone and email, to communicate with prospective purchasers of lots in the VSM Subdivision.

## COUNT I

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B) and
## (C):  The Plaintiff Property Reports Failed to Disclose Material Facts
## About Title to the VSM Land

### (All Plaintiffs against Defendants GINN-LA WEST END, STEWART TITLE, MASTERS and BOBBY GINN)

172.      Plaintiffs re-allege the allegations set forth in paragraphs 1-171as though fully set forth below.

173.      The June 28, 2006 Property Report provided to Plaintiffs LILES and CICOLANI PARTNERSHIP ("June 28, 2006 Property Report") omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

174.      The September 12, 2006 Property Report provided to Plaintiffs WEBB, JOSEPHSON, ANDREWS GROUP, BALLINGER and KHERKHER ("September 12, 2006 Property Report") omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

175.      Both the June 28, 2006 Property Report and the September 12, 2006 Property Report (collectively, "Plaintiff Property Reports") failed to disclose material facts concerning the condition of the title to the VSM Land, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C), as well as 24 C.F.R. §1710.102(f).  More specifically:

a.   The Plaintiff Property Reports failed to disclose that Section 7(b) of the GBHC Contract provided that GINN DEVELOPMENT accepted title to the VSM Land subject to certain "Permitted Title Exceptions."

b.   The Plaintiff Property Reports failed to disclose that the "Title Exceptions," as set forth in the GBHC Contract, stated that "GBHC may not hold fee simple documentary title to approximately 80 acres" which were denominated as "Parcel E."

c.   The Plaintiff Property Reports failed to disclose that Section 7(d) of the GBHC Contract provided that GINN DEVELOPMENT was "aware of the existence of litigation styled Angela Williams v. Grand Bahama Properties Limited, West End Resorts, Ltd., Old Bahama Bay Management Limited, and Old Bahama Community Association Ltd. (the "Williams Litigation")" and that GINN DEVELOPMENT "agreed to accept Title to the Property subject to the Litigation."

d.   The Plaintiff Property Reports failed to disclose that Defendant GINN-LA WEST END did initiate Supreme Court Action No. 59 of 2005 in Freeport, wherein it asked the Bahamas Supreme Court to determine what land had been conveyed to GBHC by Charles A. Sammons, the predecessor in title to GBHC in order to determine what land GBHC had conveyed to GINN DEVELOPMENT through the GBHC Contract.

    e.   The Plaintiff Property Reports failed to disclose that GBHC filed Action No. 511 of 2005 in Nassau to obtain a certificate of title in the name of Defendant GINN-LA WEST END for 179.1 acres of the VSM Land, which acreage included that 80 acre portion of the VSM Land denominated as Parcel E in the GBHC Contract.

    f.   The Plaintiff Property Reports failed to disclose that, upon information and belief, GBHC and GBHC'S counsel failed to inform the Supreme Court in Action No. 511 of 2005 that Defendant GINN-LA WEST END had filed Action No. 59 of 2005.

    g.   The Plaintiff Property Reports failed to disclose that, upon information and belief, Defendant GINN-LA WEST END and its counsel failed to inform the Supreme Court in Action No. 59 of 2005 that GBHC had filed Action No. 511 of 2005.

    h.   The Plaintiff Property Reports failed to disclose facts concerning the proceedings in Action No. 511 of 2005, including the misleading representations by counsel for GBHC to the Bahamian Supreme Court, and the failure of either GBHC or Defendant GINN-LA WEST END to meet the requirements of the Bahamian Quieting of Titles Act.

176.      These facts concerning the condition of the title to the VSM Land were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

177.    By failing to disclose material facts concerning the condition of the title to the VSM Land, Defendants GINN-LA WEST END, STEWART TITLE , MASTERS and BOBBY GINN did not provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

178.    Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

179.    Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

180.    Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

181.    Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

182.    Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the

return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

183.     Because the Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and 24 C.F.R. §1710.102(f), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

184.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

185.     Defendants GINN-LA WEST END, STEWART TITLE, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT II

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B) and (C):  The Plaintiff Property Reports Failed to Disclose Material Facts Concerning Property Taxes

### (All Plaintiffs against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN)

186.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 185 as though fully set forth below.

187.     The Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

188.     The Plaintiff Property Reports failed to disclose material facts concerning the obligations of a purchaser in the VSM Subdivision to pay property taxes, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C), as well as 24 C.F.R. § 1710.102(f).

189.     The Plaintiff Property Reports failed to provide the information on property taxes that is required by 24 C.F.R. § 1710.116(b)(1), namely:

   a.   "When will the purchaser's obligation to pay taxes begin?"

   b.   "To whom are the taxes paid?"

   c.   "What are the annual taxes on an unimproved lot after the sale to a purchaser?"

66

190.    The Plaintiff Property Reports also failed to include an estimate of annual taxes on the Cost Sheet, as required by 24 C.F.R. § 1710.117(a)(2)(i) and (vii), which estimate was required to have been "based on the projected valuation of the lot after sale to a purchaser."

191.    The Plaintiff Property Reports failed to include an estimate of annual taxes on the Cost Sheet prior to sending the Property Report to Plaintiffs through the mails, as required under 24 C.F.R. § 1710.118(c).

192.    These facts concerning property taxes were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

193.    By failing to disclose material facts concerning the obligations of a purchaser in the VSM Subdivision to pay property taxes, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did not provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

194.    Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

195.    Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

196.     Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

197.     Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

198.     Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

199.     Because the Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707, 24 C.F.R. §1710.102(f), 24 C.F.R. § 1710.116(b)(1), 24 C.F.R. § 1710.117(a)(2)(i) and (vii), and 24 C.F.R. § 1710.118(c), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

200.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

201.     Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT III

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B) and (C):  The Plaintiff Property Reports Failed to Disclose Material Facts About Blanket Encumbrance

**(All Plaintiffs against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN)**

202.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 201 as though fully set forth below.

203.     The Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

204.     The Plaintiff Property Reports failed to "explain the effect of any release provisions of any blanket encumbrance, mortgage or lien," in violation of 15 U.S.C. § 1703(a)(1)(B) and (C), as well as 24 C.F.R. § 1710.109(c)(2)(i).  More specifically:

a. The Plaintiff Property Reports failed to disclose the fact that Ginn had obtained a $675 million credit facility through Credit Suisse.

b. The Plaintiff Property Reports failed to explain the effect of any release provisions of the Credit Suisse Credit Facility upon purchasers of affected lots in VSM.

205.     The Plaintiff Property Reports also failed to include the applicable required statement under 24 C.F.R. § 1710.109(c)(2)(i).

206.     These facts concerning the Credit Suisse blanket encumbrance were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

207.     By failing to "explain the effect of any release provisions of any blanket encumbrance, mortgage or lien," and failing to include the applicable required statement in violation of 24 C.F.R. § 1710.109(c)(2)(i), Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are did not provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

208.     Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

209.      Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

210.      Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

211.      Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

212.      Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

213.      Because the Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and 24 C.F.R. § 1710.109(c)(2)(i), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

214.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action. Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

215.     Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT IV

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B): The Plaintiff Property Reports Failed to Include an Executed Agent Certification

### (All Plaintiffs against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN)

216.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 215 as though fully set forth below.

217.     The Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B).

218.     The Plaintiff Property Reports failed to include an executed Agent Certification, in violation of 15 U.S.C. § 1703(a)(1)(B), as well as 24 C.F.R. § 1710.118.

219.     The final page of each of the Plaintiff Property Reports includes an agent certification section as required under 24 C.F.R. § 1710.118:

*AGENT CERTIFICATION*

*I certify that I have made no representations to the person(s) receiving this Report which are contrary to the information contained in this Report.*

*Lot* _____ *Block* _____ *Section* _____

*Name of salesperson* _____

*Signature* _____ *Date* _____

220.     However, the Agent Certification section was never executed in the Plaintiff Property Reports, in violation of 24 C.F.R. § 1710.118.

221.     By failing to ensure that the Agent Certification sections of the Plaintiff Property Reports were executed, as required under 24 C.F.R. § 1710.118, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did not provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

222.     Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

223.     Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

224.     Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

225.     Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

226.     Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

227.     Because the Agent Certification sections of the Plaintiff Property Reports were not executed, in violation of 15 U.S.C. § 1703(a)(1)(B), as well as 24 C.F.R. § 1710.118, all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

228.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

229.     Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT V

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B) and (C):  The Plaintiff Property Reports Failed to Include Material Facts Concerning the Manner of Recording of a Conveyance Deed in the Bahamas

### (All Plaintiffs against Defendants GINN-LA WEST END, STEWART TITLE, MASTERS and BOBBY GINN)

230.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 229 as though fully set forth below.

231.     The Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

232.     The Plaintiff Property Reports failed to include materials facts concerning the manner of recording of a Conveyance Deed in the Bahamas and the related risks to a purchaser, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C), as well as 24 C.F.R. §1710.102(f).  More specifically:

a. The Plaintiff Property Reports state that, *"All Deeds will be recorded by the Title Company, as closing agent, in accordance with Bahamian law. We, through the Title Company, will deliver to you a recorded Deed."*

b. The Plaintiff Property Reports include a warning, as required under 24 C.F.R. §1710.109(d)(1)(iv), that: *"UNLESS YOUR DEED IS RECORDED YOU MAY LOSE YOUR LOT THROUGH THE CLAIMS OF SUBSEQUENT BUYERS OR SUBSEQUENT CREDITORS OF ANYONE HAVING AN INTEREST IN THE LAND."*

233.     However, the Plaintiff Property Reports fail to inform prospective purchasers that the Conveyance Deeds for lots purchased in the VSM Subdivision were routinely not recorded until several months following the closing dates for the sale of those lots.

234.     The fact that the Conveyance Deeds for lots purchased in the VSM Subdivision were routinely not recorded until several months following the closing dates for the sale of those lots, was material because a reasonable prospective purchaser would consider that fact important in making a decision whether to purchase a lot in the VSM Subdivision.

235.     By failing to disclose materials facts concerning the manner of recording of a Conveyance Deed in the Bahamas and the related risks to a purchaser, Defendants GINN-LA WEST END, STEWART TITLE, MASTERS and BOBBY GINN did not

provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

236.      Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

237.      Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

238.      Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

239.      Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

240.      Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

241.      Because the Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and 24 C.F.R.

§1710.102(f), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

242.    In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

243.    Defendants GINN-LA WEST END, STEWART TITLE, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT VI

### Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(1)(B) and (C):  The Plaintiff Property Reports Failed to Include Material Facts About the Financial Ability of Defendants GINN ENTITIES to Complete the VSM Subdivision as Marketed

### (All Plaintiffs against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN)

244.    Plaintiffs re-allege the allegations set forth in paragraphs 1- 243 as though fully set forth below.

78

245.     The Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and the regulations promulgated under those sections, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C).

246.     The Plaintiff Property Reports failed to include materials facts concerning the financial ability of Defendant GINN-LA WEST END to develop and operate the VSM Subdivision as marketed, in violation of 15 U.S.C. § 1703(a)(1)(B) and (C), as well as 24 C.F.R. §1710.102(f).  For example:

   a.   The Plaintiff Property Reports failed to include any information on the financial resources of Defendant GINN-LA WEST END or its ability to ensure the completion of the VSM Subdivision as marketed.

   b.   Upon information and belief, the Plaintiff Property Reports failed to disclose that the only funds set aside for the development of the VSM Subdivision consisted of a $124 million escrow to fund the remaining canal system and infrastructure, and a $36 million escrow to complete one golf course.

   c.   Upon information and belief, the Plaintiff Property Reports failed to disclose that there were limits on the amount of funding that Defendant GINN-LA WEST END'S partner in the project, Lubert Adler, would commit to ensure the completion of VSM as marketed.

   d.   Upon information and belief, the Plaintiff Property Reports failed to disclose that the completion of the VSM Subdivision as marketed would

be in jeopardy if GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER defaulted on the Credit Suisse Credit Facility.

e.  Upon information and belief, the Plaintiff Property Reports failed to disclose that the Credit Suisse Credit Facility was obtained to fund the development of four different subdivisions being developed by purportedly different Ginn corporate entities; that the ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet the payment obligations under the Credit Suisse Credit Facility was dependent, to some degree, upon the United States real estate market and particularly on the Florida real estate market; that the ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet the payment obligations under the Credit Suisse Credit Facility was dependent, to some degree, upon the success of each of the Credit Suisse Financed Subdivisions; and that ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet the payment obligations under the Credit Suisse Credit Facility was dependent, to some degree, upon the financial stability of each of the purportedly distinct GINN corporate entities that was developing the Credit Suisse Financed Subdivisions.

f.  Upon information and belief, the Plaintiff Property Reports failed to disclose that, because the Credit Suisse Credit Facility was tied to three other GINN developments within the United States, a downturn in the

Florida or U.S. real estate markets could affect the ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet their payment obligations under the Credit Suisse Credit Facility, thereby jeopardizing the completion of the VSM Subdivision as marketed.

g.  Upon information and belief, the Plaintiff Property Reports failed to disclose that the capitalization of the VSM Subdivision was dependent upon the sales of lots within the VSM Subdivision; that if Defendant GINN-LA WEST END did not make sales of lots in the VSM Subdivision at a rate sufficient to satisfy the obligations of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER under the Credit Suisse Credit Facility, the lenders under the Credit Suisse Credit Facility would be entitled to take ownership of those portions of the VSM Land that were pledged as collateral; or that if GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER defaulted on their obligations under the Credit Suisse Credit Facility, so that the lenders under the Credit Suisse Credit Facility took ownership of those portions of the VSM Land that were pledged as collateral, Defendant GINN-LA WEST END could lose the rights to control the development and operation of the VSM Subdivision.

h.  The Plaintiff Property Reports failed to disclose the potential effects that a default on the Credit Suisse Credit Facility could have on the value and marketability of lots in the VSM Subdivision.

i.   The Plaintiff Property Reports failed to disclose other materials facts concerning the financial ability of Defendant GINN-LA WEST END to develop and operate the VSM Subdivision as marketed, which facts were known by Defendants GINN-LA WEST END, MASTERS and BOBBY GINN but unknown to potential purchasers in the VSM Subdivision, including Plaintiffs.

247.   Facts concerning the financial ability of Defendant GINN-LA WEST END to complete the VSM Subdivision as marketed were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

248.   Facts concerning the sources of and amounts of funding for the VSM Subdivision as marketed were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

249.   Facts concerning the terms of the Credit Suisse Credit Facility, including the number of Ginn developments funded by that financing, were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

250.   Facts concerning the capitalization of the VSM Subdivision were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

251.     Facts concerning the factors affecting the financial ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet their payment obligations under the Credit Suisse Credit Facility were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

252.     Facts concerning the potential effects that a default on the Credit Suisse Credit Facility could have on the value and marketability of lots in the VSM Subdivision were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

253.     By failing to disclose materials facts concerning the financial ability of Defendant GINN-LA WEST END to complete the VSM Subdivision as marketed, facts concerning the terms of the Credit Suisse Credit Facility, facts concerning the capitalization of the VSM Subdivision, facts concerning the factors affecting the financial ability of GINN-LA CS BORROWER and/or GINN-LA CONDUIT LENDER to meet their payment obligations under the Credit Suisse Credit Facility and facts concerning the potential effects that a default on the Credit Suisse Credit Facility could have on the value and marketability of lots in the VSM Subdivision, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did not provide Plaintiffs with a Property Report meeting the requirements of 15 U.S.C. § 1703, et seq., and the regulations promulgated under those sections.

254.     Pursuant to 15 U.S.C. § 1703(c), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

255.     Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

256.     Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

257.     Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

258.     Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contract, together with interest.

259.     Because the Plaintiff Property Reports omitted to state material facts required to be stated therein pursuant to 15 U.S.C. §§ 1704-1707 and 24 C.F.R. §1710.102(f), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to

all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

260.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.   Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

261.     Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT VII

### Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(d): Plaintiffs' Contracts Failed to Include Mandatory Language On Remedies After Default

### (All Plaintiffs against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN)

262.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 261 as though fully set forth below.

263.     The LILES CONTRACT, WEBB CONTRACT, JOSEPHSON CONTRACT, ANDREWS GROUP CONTRACT, CICOLANI PARTNERSHIP CONTRACT, BALLINGER CONTRACT, and KHERKHER CONTRACT (collectively,

the "Plaintiff Contracts") each failed to include required language concerning remedies after default in violation of 15 U.S.C. § 1703(d). More specifically:

    a.   The Plaintiff Contracts failed to provide the notice required under 15 U.S.C. § 1703(d)(2). Instead, the Plaintiff Contracts set forth expanded remedies for the seller in the event of a default by the purchaser, namely:

        i.   The Plaintiff Contracts only provided the purchaser with 10 days to cure a default, rather than the statutorily required 20 days.

        ii.   The Plaintiff Contracts provided that the cure period begins to run from the time the seller delivers notice of default, rather than from the date of the purchaser's receipt of the notice of default.

    b.   The Plaintiff Contracts failed to limit the Seller's remedies for breach, as required under 15 U.S.C. § 1703(d)(3)(A)-(B).

264.      The Plaintiff Contracts contained provisions for the seller's remedies in the event of a default by the purchaser that are different from the remedies described in the Plaintiff Property Reports, in violation of 15 U.S.C. § 1703(a) and 24 CFR § 1710.109(e)(3).

265.      By failing to include required language in the Plaintiff Contracts concerning remedies after default, by failing to limit the Seller's remedies for breach, and by including provisions for the seller's remedies in the event of a default by the purchaser that are different from the remedies described in the Plaintiff Property Reports,

Defendants GINN-LA WEST END, MASTERS and BOBBY GINN violated 15 U.S.C. § 1703(a), 15 U.S.C. § 1703(d), and the regulations promulgated under those sections.

266.    Pursuant to 15 U.S.C. § 1703(d), Plaintiffs each had the option to revoke their contracts for the purchase of lots in the VSM Subdivision within two years from the date of signing.

267.    Plaintiff WEBB did exercise his right to revoke the WEBB CONTRACT with a letter of December 5, 2008.   Plaintiff WEBB has not received any response to his revocation letter.

268.    Plaintiff BALLINGER did exercise her right to revoke the BALLINGER CONTRACT with a letter of September 28, 2008.  In a response letter dated October 3, 2008, GINN RESORTS did refuse to honor Plaintiff BALLINGER'S rescission rights granted in 15 U.S.C. § 1703(c) and (e).

269.    Plaintiff KHERKHER did exercise her right to revoke the KHERKHER CONTRACT with a letter of September 2, 2008.  Plaintiff KHERKHER has not received any response to her revocation letter.

270.    Wherefore, Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts, together with interest.

271.    Because Defendants GINN-LA WEST END, MASTERS and BOBBY GINN failed to include required language in the Plaintiff Contracts concerning remedies

after default, failed to limit the Seller's remedies for breach, and included provisions for the seller's remedies in the event of a default by the purchaser that are different from the remedies described in the Plaintiff Property Reports, all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest. Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

272.    In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action. Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

273.    Defendants GINN-LA WEST END, MASTERS and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT VIII

## Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(2)(A) and (C):  Unlawful Sales Practices

**(All Plaintiffs against Defendants GINN-LA WEST END, MASTERS, CONWAY, PICKET FENCE and BOBBY GINN)**

274.　　Plaintiffs re-allege the allegations set forth in paragraphs 1- 273 as though fully set forth below.

275.　　Defendants GINN-LA WEST END, MASTERS, CONWAY, PICKET FENCE and BOBBY GINN did utilize fraudulent or misleading sales practices in violation of 15 U.S.C. § 1703(a)(2)(A) and (C), as well as the regulations promulgated under those sections.

276.　　All representations by Defendants GINN-LA WEST END, MASTERS, CONWAY, PICKET FENCE and BOBBY GINN, either individually or through their agents, officers or representative, that were made for purposes of inducing persons to buy a lot in the VSM Subdivision, constitute "sales practices" under 24 C.F.R. § 1715.10.

277.　　As alleged more fully in paragraph 89, Defendant CONWAY and Ginn Sales Executive Howie Malloy did make repeated representations over the radio to the general public that lots in the VSM Subdivision had good investment potential and would increase in value without the mandatory supporting written documentation required under 24 C.F.R. § 1715.20(h), in violation of 15 U.S.C. § 1703(a)(2)(A) and (C).

278.     The representations made by Defendant CONWAY and Ginn Sales Executive Howie Malloy that lots in the VSM Subdivision had good investment potential and would increase in value, were material because a reasonable prospective purchaser would consider the facts important in making a decision whether to purchase a lot in the VSM Subdivision.

279.     As a result of the repeated representations by Defendant CONWAY and Ginn Sales Executive Howie Malloy, over the radio to the general public, that lots in the VSM Subdivision had good investment potential and would increase in value without the mandatory supporting written documentation required under 24 C.F.R. § 1715.20(h), all Plaintiffs are entitled under 15 U.S.C. § 1709, to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

280.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

281.     Defendants GINN-LA WEST END, MASTERS, CONWAY, PICKET FENCE and BOBBY GINN are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT IX

### Violation of Interstate Land Sales Full Disclosure Act 15 U.S.C. § 1703(a)(2)(A): Fraudulent or Misleading Sales Practices

**(Plaintiffs LILES, JOSEPHSON and BALLINGER against Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE)**

282.    Plaintiffs re-allege the allegations set forth in paragraphs 1- 281 as though fully set forth below.

283.    Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE did employ a device, scheme or artifice to defraud in violation of 15 U.S.C. § 1703(a)(2)(A) and the regulations promulgated under those sections.

### The LILES CONTRACT was Not Properly Executed

284.    Plaintiffs LILES signed a Power of Attorney authorizing attorney Richard T. Davis to execute the LILES CONTRACT on their behalf.

285.    In fact, Richard T. Davis did not lawfully execute the LILES CONTRACT as the attorney-in-fact for Plaintiffs LILES.  Although the names of Plaintiffs LILES both appear on the contract, there is no signature for Plaintiff PATRICIA M. LILES.

### The JOSEPHSON Conveyance Deed and Closing Documents were Not Witnessed and a Fraudulent Affidavit of Witness was Submitted to the Bahamian Government

286.    The copy of the Conveyance Deed provided to Plaintiff JOSEPHSON by G.B. Completions Title Insurance Agency Ltd., an agent of Defendant STEWART

TITLE, includes a notarized affidavit wherein an individual by the name of Chris Matoska, of One Hammock Beach Parkway, Palm Cost, Florida, swears that he witnessed Plaintiff JOSEPHSON execute the Conveyance Deed for Lot 493 in the VSM Subdivision, which Conveyance Deed was dated December 13, 2006 ("Lot 493 Conveyance Deed").

287.    Upon information and belief, Chris Matoska was at all times relevant to the allegations herein an agent and representative acting on behalf of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE.

288.    In actual fact, Chris Matoska did not witness Plaintiff JOSEPHSON execute the Lot 493 Conveyance Deed.  No individual witnessed Plaintiff JOSEPHSON execute the Lot 493 Conveyance Deed or any other closing documents for the purchase of Lot 493 in the VSM Subdivision.

289.    Upon information and belief, Chris Matoska, as an agent and representative acting on behalf of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE, did fraudulently swear that he witnessed Plaintiff JOSEPHSON execute the Lot 493 Conveyance Deed in an effort to induce the Bahamian Government to issue a recorded version of the Lot 493 Conveyance Deed without going through the proper procedures required for the recording of a Conveyance Deed under Bahamian law.

## The BALLINGER Conveyance Deed and Closing Documents were Not Witnessed and a Fraudulent Affidavit of Witness was Submitted to the Bahamian Government

290.     The copy of the Conveyance Deed provided to Plaintiff BALLINGER by G.B. Completions Title Insurance Agency Ltd., an agent of Defendant STEWART TITLE, includes an undated notarized affidavit wherein an individual by the name of John Douglas Hardy, of 3310 N. Ocean Shore Blvd., Flagler Beach, Florida, swears that he witnessed Plaintiff BALLINGER execute the Conveyance Deed for Lot 222 in the VSM Subdivision, which Conveyance Deed was dated December 22, 2006 ("Lot 222 Conveyance Deed").

291.     Upon information and belief, John Douglas Hardy was at all times relevant to the allegations herein an agent and representative acting on behalf of Defendants GINN ENTITIES, MASTERS, BOBBY GINN and STEWART TITLE.

292.     In actual fact, John Douglas Hardy did not witness Plaintiff BALLINGER execute the Lot 222 Conveyance Deed.  No individual witnessed Plaintiff BALLINGER execute the Lot 222 Conveyance Deed or any other closing documents for the purchase of Lot 493 in the VSM Subdivision.

293.     Upon information and belief, John Douglas Hardy, as an agent and representative acting on behalf of Defendants GINN ENTITIES, MASTERS, BOBBY GINN and STEWART TITLE, did fraudulently swear that he witnessed Plaintiff BALLINGER execute the Lot 222 Conveyance Deed, in an effort to induce the Bahamian Government to issue a recorded version of the Lot 222 Conveyance Deed

without going through the proper procedures required for the recording of a Conveyance Deed under Bahamian law.

## The Fraudulent Device, Scheme and Artifice of Defendants Renders Void the Purchases of Plaintiffs LILES, JOSEPHSON and BALLINGER

294.     As a result of the actions of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE, who did employ a device, scheme or artifice to defraud, the LILES CONTRACT should be declared void.

295.     As a result of the actions of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE, who did employ a device, scheme or artifice to defraud, the Conveyance Deeds and all other closing documents for Plaintiffs BALLINGER and JOSEPHSON should be declared void.

296.     As a result of the actions of Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE, who did employ a device, scheme or artifice to defraud, Plaintiffs are entitled under 15 U.S.C. § 1709 to their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

297.     In addition, Plaintiffs had to retain the services of attorneys, and did incur attorney fees and costs for the prosecution of this action.  Wherefore, Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

298.     Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT X

### Conspiracy to Defraud

### (All Plaintiffs against Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL)

299.     Plaintiffs re-allege the allegations set forth in paragraphs 1- 298 as though fully set forth below.

300.     Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL did knowingly conspire in an effort to, by concerted action, conceal the true facts to prospective purchasers in the VSM Subdivision concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision.

301.     As a result of their concerted action to conceal the true facts to prospective purchasers in the VSM Subdivision concerning the Title Exceptions in the GBHC Contract, and the true facts concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision,

Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL did conceal the following material facts:

    a.  GINN DEVELOPMENT purchased the VSM Land from GBHC subject to a Title Exception for the Williams Litigation.

    b.  GINN DEVELOPMENT purchased the VSM Land from GBHC subject to a Title Exception for the 80 acre tract denominated in the GBHC Contract as Parcel E.

    c.  Upon information and belief, GINN-LA WEST END filed Action No. 59 of 2005 against GBHC in Freeport, asking the Supreme Court determine what land had been conveyed to GBHC by Charles A. Sammons, the predecessor in title to GBHC.

    d.  Upon information and belief, Defendant GINN-LA WEST END intended to utilize Action No. 59 of 2005 to determine precisely what land GBHC had title to at the time of the closing date for the sale of the VSM Land by GBHC to GINN DEVELOPMENT, and therefore what land GBHC had conveyed to GINN DEVELOPMENT through the GBHC Contract.

    e.  Upon information and belief, GBHC filed Action No. 511 of 2005 in Nassau, asking the Supreme Court to issue a certificate of title to Defendant GINN-LA WEST END for 179.1 acres of the VSM Land, which acreage included that 80 acre tract of the VSM Land denominated in the GBHC Contract as Parcel E.

f.   Upon information and belief, Defendant GINN-LA WEST END was not a petitioner in Action No. 511 of 2005.  Upon information and belief, the sole petitioner in Action No. 511 of 2005 was GBHC.

g.   Upon information and belief, GBHC did represent to the Supreme Court in Action No. 511 of 2005 that GBHC had good and marketable title to the 179.1 acres that were the subject of Action No. 511 of 2005.

h.   Upon information and belief, counsel for GBHC did represent to the Supreme Court in Action No. 511 of 2005 that GBHC had complied with the requirements of the Bahamas Quieting Titles Act, and had produced a good root of title exceeding the statutorily required period of 30 years.

i.   The Judgment issued by the Supreme Court in Action No. 511 of 2005 set forth what counsel for GBHC had represented to the Supreme Court concerning the reason GBHC was seeking a certificate of title to be issue to Defendant GINN-LA WEST END: *"Noting that the Petitioner was satisfied that it had a good and marketable title counsel informed the court that the reason the Petitioner had sought a Certificate was because there were two plans and those plans showed a discrepancy in trying to total the entirety of the strips set out in the second plan to conform with the total acreage."*

j.   Upon information and belief, GBHC and GBHC'S counsel knew that the reason given to the Supreme Court for seeking the Certificate of Title,

(i.e., clearing up a discrepancy between two plans), was false and misleading.

k.   Upon information and belief, GBHC and GBHC'S counsel were using Action No. 511 of 2005 to obtain a Certificate of Title for Defendant GINN-LA WEST END for that 80 acre tract denominated in the GBHC Contract as Parcel E by hiding that 80 acre tract within the larger 179.1 acre tract that was the subject of Action No. 511.

l.   Upon information and belief, GBHC and GBHC'S counsel knew that GBHC did not have good and marketable title to that 80 acre tract of the 179.1 acres, which 80 acres had been denominated in the GBHC Contract as Parcel E, because the GBHC Contract provided that, *"GBHC may not hold fee simple documentary title to approximately 80 acres of the Land, depicted as Parcel 'E.'"*

m.   Upon information and belief, GBHC and GBHC'S counsel failed to inform the Supreme Court in Action No. 511 of 2005 that the GBHC Contract provided that *"GBHC may not hold fee simple documentary title to approximately 80 acres of the Land, depicted as Parcel 'E.'"*

n.   Upon information and belief, GBHC and GBHC'S counsel also failed to inform the Supreme Court in Action No. 511 of 2005 of the ruling in Supreme Court in Action No. 59 of 2005.

98

    o.   Upon information and belief, GBHC did not meet the requirements of the Bahamian Quieting Titles Act in Action No. 511 of 2005.

302.      Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE took the following overt actions in furtherance of their conspiracy:

    a.   Upon further information and belief, Defendant STEWART TITLE, either on its own behalf or through its agent G.B. Completions Title Insurance Agency Ltd., did conduct a title investigation on the VSM Land prior to the closing date for GINN DEVELOPMENT'S purchase of the VSM Land through the GBHC Contract.

    b.   Upon information and belief Defendant STEWART TITLE did supply a Policy of Title Insurance to GINN DEVELOPMENT and/or Defendant GINN-LA WEST END for GINN DEVELOPMENT'S purchase of the VSM Land through the GBHC Contract.

    c.   Upon information and belief, Defendant STEWART TITLE entered into an agreement with Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and GINN FINANCIAL whereby STEWART TITLE agreed to provide title insurance policies for lots in the VSM Subdivision. The availability of title insurance protection from Defendant STEWART TITLE was a marketing device for Defendants GINN-LA WEST END, MASTERS and BOBBY GINN.

d.  Upon information and belief, G.B. Completions Title Insurance Agency Ltd. was formed by Defendant STEWART TITLE on or about 2006 for the sole purpose of facilitating closings for the sales of lots in the VSM Subdivision.  Upon information and belief, G.B. Completions Title Insurance Agency Ltd. never facilitated any real estate closings other than those for lots in the VSM Subdivision.

e.  Defendant GINN-LA WEST END, MASTERS and BOBBY GINN did create advertising and promotional materials that indicated STEWART TITLE would provide title insurance and escrow protection for purchasers in the VSM Subdivision.

f.  Upon information and belief, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN did provide marketing materials to several different brokers that were "authorized sales representative[s] of Ginn sur Mer," for the purpose of setting up websites marketing VSM.  The VSM marketing websites, which were all substantially the same, featured the "Ginn sur Mer" logo, VSM artist renderings, and descriptions of the VSM Subdivision as it would purportedly be developed.  Under the heading "11 Reasons to Invest in Ginn Sur Mer," the VSM marketing websites represented that, *"Full consumer protection with Escrow is offered through Stewart Title."*

g.  In the Plaintiff Property Reports, Defendants GINN-LA WEST END, MASTERS and BOBBY GINN represented to prospective purchasers in

the VSM Subdivision that Defendant GINN-LA WEST END would pay for and deliver to every purchaser a Standard Owner's Title Insurance Commitment issued by Defendant STEWART TITLE, through which Defendant STEWART TITLE would agree to insure a purchaser's title in the lot in the amount of the total purchase price for the lot. The Plaintiff Property Reports also provided that, *"If the Title Report shows that your title is subject to matters which are not provided for in the Contract, you shall, within five (5) days of receiving the Title Report, notify us in writing specifying the details of such matters ("Title Defects"),"* and set forth a notice and cure procedure for any such Title Defects.

h.  Upon information and belief, Defendant STEWART TITLE, either on its own behalf or through its agent G.B. Completions Title Insurance Agency Ltd., did conduct a title investigation on the VSM Land prior to the closing date for Plaintiffs lot purchases in the VSM Subdivision.

i.  Defendants GINN-LA WEST END and STEWART TITLE provided Plaintiffs with Standard Owner's Title Insurance Commitments issued by Defendant STEWART TITLE, through which Defendant STEWART TITLE agreed to insure Plaintiffs' title in their respective lots in the VSM Subdivision in the amount of the total purchase price for each lot.

j.  The Standard Owner's Title Insurance Commitments issued by Defendant STEWART TITLE did not disclose the true facts concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and

Defendants GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision.

k.  Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE did not provide Plaintiffs with any other title report or information disclosing the true facts concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision.

l.  Following each Plaintiff's closing date for the purchase of a lot in the VSM Subdivision, G.B. Completions Title Insurance Agency Ltd. Sent Plaintiffs a package of documents that included a copy of the Policy of Title Insurance issued by Defendant STEWART TITLE.  The cover letter from G.B. Completions Title Insurance Agency Ltd. stated that it was *"an agent of"* Defendant STEWART TITLE.

m.  Defendant STEWART TITLE has failed and refused to provide a coverage decision in response to claim letters sent by Plaintiffs LILES, JOSEPHSON, ANDREWS GROUP, BALLINGER and KHERKHER. Upon information and belief, Defendant STEWART TITLE has failed and refused to provide a coverage decision to these Plaintiffs because to do so would require Defendant STEWART TITLE to disclose the true facts concerning the Title Exceptions in the GBHC Contract and concerning

efforts by GBHC and Defendants GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision.

303.     The true facts concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendants GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision, were material because a reasonable prospective purchaser would consider such facts important in making a decision whether to purchase a lot in the VSM Subdivision.

304.     Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL knew that the true facts concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision would be a material consideration for prospective purchasers, including Plaintiffs, when they were deciding whether or not to purchase a lot in the VSM Subdivision.

305.     Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL engaged in a conspiracy to conceal the true facts concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision as part of their effort to induce prospective purchasers, including Plaintiffs, to purchase lots in the VSM Subdivision.

306.     Unaware of the existence of the conspiracy between Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL, unaware of the true facts concerning the Title Exceptions in the GBHC Contract and unaware of the true facts concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision, Plaintiffs purchased their lots in the VSM Subdivision.

307.     If Plaintiffs had been aware of the existence of the conspiracy between Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL, aware of the true facts concerning the Title Exceptions in the GBHC Contract, or aware of the true facts concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision, Plaintiffs would not have purchased their lots in the VSM Subdivision.

308.     Plaintiffs suffered damages, in an amount to be proven at trial, as a result of the acts undertaken by Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL in furtherance of the conspiracy to conceal the true facts to prospective purchasers in the VSM Subdivision concerning the Title Exceptions in the GBHC Contract and concerning efforts by GBHC and Defendant GINN-LA WEST END to obtain clear title to certain tracts of Land within the VSM Subdivision.  Plaintiffs' damages may include, but are not limited to, all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property and all interest allowable by law.

309.     Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL are jointly and severally liable for Plaintiffs' damages as alleged in this Count because each of their acts and omissions contributed to and caused such damages.

## COUNT XI

## Fraud

### (Plaintiff BALLINGER against Defendant CONWAY)

310.     Plaintiff BALLINGER re-alleges the allegations set forth in paragraphs 1-309 as though fully set forth below.

311.     Defendant CONWAY did hold himself out to the general public as having expertise in real estate and real estate investing.  In addition, Defendant CONWAY did hold himself out to the general public as having prior knowledge and experience with various Ginn entities and developments around the country.

312.     As set forth more fully in paragraphs 90 through 94, Defendant CONWAY did falsely represent to the general public on the "Home Team" radio show that he had purchased a lot in the VSM Subdivision.

313.     Plaintiff BALLINGER did tune in to the "Home Team" radio show on August 13, 2006 and August 23, 2006 to listen to Defendant CONWAY talk about the VSM Subdivision and did hear Defendant CONWAY'S representations that he had purchased a lot in the VSM Subdivision.

314.     At the time Defendant CONWAY did represent to the general public on the "Home Team" radio show that he had purchased a lot in the VSM Subdivision, Defendant CONWAY knew those representations to be false. In fact, Defendant CONWAY'S representations were false because he never purchased a lot in the VSM Subdivision.

315.     Defendant CONWAY intended that his false representations that he had purchased a lot in the VSM Subdivision would induce prospective purchasers listening to the "Home Team" radio show to purchase lots in the VSM Subdivision.

316.     In making her decision to purchase a lot in the VSM Subdivision, Plaintiff BALLINGER did justifiably rely on the representations of Defendant CONWAY that he had purchased a lot in the VSM Subdivision. In light of Defendant CONWAY'S professed expertise in real estate, real estate investing and other Ginn developments, Defendant CONWAY'S false representations that he had purchased a lot in the VSM Subdivision were a material consideration for Plaintiff BALLINGER when she was deciding whether or not to purchase a lot in the VSM Subdivision.

317.     In reliance on Defendant CONWAY'S false representations that he had purchased a lot in the VSM Subdivision, Plaintiff BALLINGER made her decision to purchase a lot in the VSM Subdivision.

318.     If Plaintiff BALLINGER had been aware that Defendant CONWAY had not, in fact, purchased a lot in the VSM Subdivision, Plaintiff BALLINGER would not have purchased a lot in the VSM Subdivision.

319.     Plaintiff BALLINGER suffered damages, in an amount to be proven at trial, when she purchased a lot in the VSM Subdivision in reliance on Defendant CONWAY'S false representation that he had purchased a lot in the VSM Subdivision. Plaintiff BALLINGER'S damages  may include, but are not limited to, all amounts paid for the purchase of her lot in the VSM subdivision, real estate taxes assessed and due, relief from future real estate taxes, independent appraisal costs and travel to and from the property and all interest allowable by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court for relief and judgment as follows:

A. For COUNTS I and V, jointly and severally against Defendants GINN-LA WEST END, STEWART TITLE , MASTERS and BOBBY GINN:

    a.  Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts.

    b.  All Plaintiffs pray for their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

    c.  All Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

B.  For COUNT II through IV and VI through VII, jointly and severally against Defendants GINN-LA WEST END, MASTERS and BOBBY GINN:

    a.  Plaintiffs WEBB, BALLINGER and KHERKHER pray for revocation of their purchase contracts for lots in the VSM Subdivision, along with the return of their deposits, interest payments, and all other amounts paid under said contracts.

    b.  All Plaintiffs pray for their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

    c.  All Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

C.  For COUNT VIII, jointly and severally against Defendants GINN-LA WEST END, MASTERS, CONWAY, PICKET FENCE and BOBBY GINN:

    a.  All Plaintiffs pray for their actual damages as proven at trial, together with interest.  Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes

108

assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

    b.  All Plaintiffs pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

D.  For COUNT IX, jointly and severally against Defendants GINN-LA WEST END, MASTERS, BOBBY GINN and STEWART TITLE:

    a.  A finding that the LILES CONTRACT is void for lack of execution.

    b.  A finding that Plaintiffs LILES' mortgage and note resulting from the LILES CONTRACT are void.

    c.  Actual damages for Plaintiffs LILES as proven at trial, together with interest.  Such damages include but are not limited to all amounts paid under the contract, mortgage and note for Lot 46; real estate taxes assessed and due; real estate taxes already paid; and relief from future real estate taxes.

    d.  A finding that Plaintiff JOSEPHSON'S Conveyance Deed and closing documents for Lot 493 are void because they were not executed before a witness and as the result of the fraudulent Affidavit of Witness filed with the Bahamian Registrar General.

    e.  A finding that Plaintiff BALLINGER'S Conveyance Deed and closing documents for Lot 222 are void because they were not executed before a

witness and as the result of the fraudulent Affidavit of Witness filed with the Bahamian Registrar General.

    f.   A finding that the resulting mortgages and notes for Lots 493 and 222 are void.

    g.   Actual damages for Plaintiffs JOSEPHSON and BALLINGER as proven at trial, together with interest. Such damages include but are not limited to all amounts paid under the contracts, mortgages and notes for Lots 493 and 222; real estate taxes assessed and due; real estate taxes already paid; and relief from future real estate taxes.

    h.   Plaintiffs LILES, JOSEPHSON and BALLINGER pray for attorney fees and costs as provided under 15 U.S.C. § 1709.

E.  For COUNT X, jointly and severally against Defendants GINN-LA WEST END, MASTERS, BOBBY GINN, STEWART TITLE and GINN FINANCIAL:

    a.   All Plaintiffs pray for their actual damages as proven at trial, together with interest. Such damages may include but are not limited to all amounts paid for the purchase of their lots in the VSM subdivision, real estate taxes assessed and due, real estate taxes already paid, relief from future real estate taxes, independent appraisal costs and travel to and from the property.

    b.   Punitive damages in an amount determined by the Court.

    c.   Any attorney fees and costs recoverable by law.

F.  For COUNT XI against Defendant CONWAY:

    a.  Actual damages as proven at trial, together with interest.  Such damages include but are not limited to all amounts Plaintiff BALLINGER paid for the purchase of Lot 222 in the VSM Subdivision, real estate taxes assessed and due, real estate taxes already paid, and relief from future real estate taxes.

    b.  Punitive damages in an amount determined by the Court.

    c.  Any attorney fees and costs recoverable by law.

G.  For ALL COUNTS:

    a.  Trial by jury of all issues triable as of right by a jury; and

    b.  Such other and further relief as the Court may deem just and proper.

111

December 17, 2008



Dana L. Ballinger – Trial Counsel

Attorney for Plaintiffs

Florida Bar No. 35278

BALLINGER LAW OFFICE
747 Windlass Way
Sanibel, Florida 33957
(239) 395-7672
(239) 395-2287 (facsimile)
dballinger@ballingerlawoffice.com